BREAUX, C. J.
The allegation has been made by plaintiff, and it appears to be borne out by the facts, that in an accident she became frightened — was jolted and shocked by the sudden movement of the cars — and she further avers that the result was her miscarriage and consequent illness.
She was married on the 7th day of September, 1902, and in December of that year she was a passenger on the cars of the defendant company. She had been, when the accident happened, in an interesting condition for about two months. It appears that she had gone by private conveyance from her own home to the home of her father, accompanied, by her husband and by her father, a day or two prior to the accident in question. The father was the driver of the spring wagon in which they drove. The distance was about 10 miles.
The road was fairly good, the team gentle, the gait was slow, and no jar was felt on the way. We are thus particular in referring to this 10-mile ride because it was a ride taken a few days prior to the short trip on the cars, and defendant in the district court sought to show that the ride over the land was the cause of the miscarriage, and not the short trip on the cars.
After her arrival at her father’s house, and until- she took the ears, she was in good health and cheerful. Her constitution was strong, and she was not inclined to nervousness.
On Sunday night, the 28th of December, 1902, she. boarded the train at Allendale for Jonesboro, her home. On entering the car she was told by the conductor that the train was crowded, and the conductor directed her, and others with whom she was, to take seats in the smoker, as there were no seats in the other passenger compartments of the train.
It was about 9 o’clock on a dark night in winter, and the cars in which she and her husband were riding became separated, i. e. disconnected. The smoker and cars ahead of it went on, and the cars in the rear of the smoker stopped, owing to the disconnection between the two. There were sharp jerks of the car, and jars felt. The car rocked from side to side, up and down. Some of the lamp chimneys were broken, and the glass scattered in and about the smoker. Part of the lights were extinguished. Immediately near, a man was slightly wounded in the face, and showed blood on his face. Plaintiff testifies that she saw the man’s bleeding face. The pressure on the bell cord of the car bore against the partition between the smoker and the car in the rear. Pieces of board were thereby torn from the partition and fell to the floor, and the bell cord broke.
There was excitem nt for the moment. The train was running at the usual speed. The track was not in good order at the place of the accident. The place was near a stream known as “Dogdemonia,” near the town of Hodge. It seems that there was mud on the track. Indeed, it was covered with mud. The lateral ditches were small. It follows that the drain was poor.
*767 Some of the witnesses charged the accident to the bad condition of the road. The coupling between the ears was automatic. When the two portions of the train were brought together again, a coupling pin was used, and some of the testimony shows that there was no coupling pin used before the accident.
At the drawhead, to add to the confusion, when the brakeman was about to complete the connection of the cars by putting the pin in its place, several persons thought that he was in some danger and hallooed to him, and thereby created further apprehension among the passengers, as they did not understand the cry of warning.
Plaintiff, as a witness examined under commission, testified that she felt a pain in her back immediately after the accident, and that on her arrival at Jonesboro, about 15 minutes after the accident, she suffered from sick stomach and internal pains; that she was taken to her home; that the next day she had hemorrhages. She suffered about a. week, and at the end of the week had an abortion. She was confined after the abortion about two weeks, and since that time she says she had- not enjoyed good health.
It may as well be stated here that when she testified she, a second time, expected to be a mother, and had been in an interesting condition for some time. This would go far toward showing that the ill effects of the abortion were not as permanent in effect as she thought, as she so Soon after the abortion was again expected to have a child.
The contention of the defendant in answer to plaintiff’s cla!ims is that she cannot recover for injuries occasioned by fright, and that her injuries were not the natural, proximate, or probable consequence of the accident, nor such as, in law, the defendant is answerable for.
In our view, the injuries were not, as contended by defendant, confined to mere fright. It follows that defendant’s defense on this score is not entirely sustained by the facts. We think there was fright, and the testimony is positive that there were consequences to this 'fright, i. e., that it caused an abortion.
If due care had been taken, and the road had been repaired so as to enable defendant to run it at average rate of speed, the accident might have been avoided.
The shock suffered was sudden and violent, and, immediately after, the pain complained of was felt.
The facts were heard by the jury. They and the judge a quo knew the witnesses, and doubtless knew something of the physicians who testified as experts, and from the facts traced the abortion to the accident. The jury saw and heard their testimony, believed them, and came to the conclusion that defendant is liable.
We have not come to the conclusion that they erred.
The argument that fright, as an element of damages, is not to be considered, has inter'esting features.
It would perhaps be convenient and expeditious, in determining suits such as this, to adopt the simple rule that no recovery of any kind can be had for fright occasioned by the negligence of another, be the fright what it may, although its consequences are most serious — such as blindness, insanity, and even miscarriage. This is a view (with which we do not agree) expressed in Mitchell v. Rochester Ry. Co. (N. Y.) 45 N. E. 354, 34 L. R. A. 781, 56 Am. St. Rep. 604, and other decisions.
There are well-reviewed opinions to the contrary in other jurisdictions, notedly Hill v. Kimbell (Tex. Sup.) 13 S. W. 59, 7 L. R. A. 618; Purcell v. St. Paul City R. Co. (Minn.) 50 N. W. 1034, 16 L. R. A. 203.
Under our jurisprudence and special laws, we would not be justified if we were to adopt this simple rule. In our Code (articles 2315-2317) the wise precept of the Institutes of Jus *769 tinian are incorporated in substance, to wit: “Juris prtecepta sunt, alterum non lsedere, suum euique tribuere,” and, as translated and inserted in our Code, its'text looks to the liability for all damages.
There is no necessity in this case to go as far as our court has gone heretofore. Even mental distress was considered as ground sufficient to decree damages. Lewis v. Holmes, 109 La. 1030, 34 South. 66, 61 L. R. A. 274.
In our case here there was immediate injury felt, and it follows that it was not the question of mere fright, or fright in itself, but fright and a violent shock, to which the illness of plaintiff was traced by sufficient and competent evidence.
The testimony is that immediate personal injury was suffered directly after the accident.
Question of damages presents the next important issue. The facts, in our view, do not warrant a large amount for damages. We cannot charge all the ills felt by plaintiff after the abortion to the accident. The testimony does not sustain a claim for a large amount for damages.
All the illness was not the consequence, we take it, of the abortion, although plaintiff may have thought it was.
While medical experts thought the accident was the cause of the abortion, they have not shown by their testimony that it was the cause of great illness after the recovery from the abortion.
We will not go into details further, for reasons which are obvious. It is safe to say that we think the verdict should be reduced.
For reasons assigned, and the law and the evidence being in favor of plaintiff, it is ordered, adjudged, and decreed that the verdict of the jury be reduced from $2,500 to $1,000, and, as amended, the judgment appealed from is affirmed.