# METRO-NORTH COMMUTER RAILROAD CO.
## *v.* BUCKLEY

No. 96–320.   Argued February 18, 1997—Decided June 23, 1997

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment in part and dissenting in part, in which STEVENS, J., joined, *post*, p. 444.

*Sheila L. Birnbaum* argued the cause for petitioner. With her on the briefs were *Barbara Wrubel, Douglas W. Dunham, Ellen P. Quackenbos,* and *Richard K. Bernard.*

*Charles C. Goetsch* argued the cause for respondent. With him on the brief were *George J. Cahill, Jr.,* and *John G. DiPersia.** 

JUSTICE BREYER delivered the opinion of the Court.

The basic question in this case is whether a railroad worker negligently exposed to a carcinogen (here, asbestos) but without symptoms of any disease can recover under the

---

*Briefs of *amici curiae* urging reversal were filed for the Port Authority of New York and New Jersey by *Milton H. Pachter, Arthur P. Berg,* and *Anne M. Tannenbaum;* for the American Insurance Association by *Kenneth W. Starr* and *Craig A. Berrington;* for the American Tort Reform Association by *Victor E. Schwartz, Mark A. Behrens,* and *Sherman Joyce;* for the Association of American Railroads by *Robert W. Blanchette* and *Ralph G. Wellington;* for the Chemical Manufacturers Association et al. by *Steven R. Kuney, Donald D. Evans, Stephen A. Bokat,* and *Robin S. Conrad;* for the Defense Research Institute et al. by *James M. Doran, Jr., Jan S. Amundson,* and *Quentin Riegel;* for Owens Corning by *Anne E. Cohen;* for Owens-Illinois, Inc., by *W. Donald McSweeney;* for the Product Liability Advisory Council, Inc., by *Robert N. Weiner;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Penelope Kilburn Shapiro.*

Briefs of *amici curiae* urging affirmance were filed for the Association of Trial Lawyers of America et al. by *Ronald Simon, Jeffrey R. White,* and *Howard F. Twiggs;* for the International Association of Machinists and Aerospace Workers et al. by *Michael L. Rustad;* and for the Rail Labor Executive Association by *Richard N. Pearson.*

Federal Employers' Liability Act (FELA or Act), 35 Stat. 65, as amended, 45 U. S. C. § 51 *et seq.*, for negligently inflicted emotional distress. We conclude that the worker before us here cannot recover unless, and until, he manifests symptoms of a disease. We also consider a related claim for medical monitoring costs, and we hold, for reasons set out below, that the respondent in this case has not shown that he is legally entitled to recover those costs.

I

Respondent, Michael Buckley, works as a pipefitter for Metro-North, a railroad. For three years (1985–1988) his job exposed him to asbestos for about one hour per working day. During that time Buckley would remove insulation from pipes, often covering himself with insulation dust that contained asbestos. Since 1987, when he attended an "asbestos awareness" class, Buckley has feared that he would develop cancer—and with some cause, for his two expert witnesses testified that, even after taking account of his now-discarded 15-year habit of smoking up to a pack of cigarettes per day, the exposure created an *added* risk of death due to cancer, or to other asbestos-related diseases, of either 1% to 5% (in the view of one of plaintiff's experts), or 1% to 3% (in the view of another). Since 1989, Buckley has received periodic medical checkups for cancer and asbestosis. So far, those checkups have not revealed any evidence of cancer or any other asbestos-related disease.

Buckley sued Metro-North under the FELA, a statute that permits a railroad worker to recover for an "injury . . . resulting . . . from" his employer's "negligence." 45 U. S. C. § 51. He sought damages for his emotional distress and to cover the cost of future medical checkups. His employer conceded negligence, but it did not concede that Buckley had actually suffered emotional distress, and it argued that the FELA did not permit a worker like Buckley, who had suffered no physical harm, to recover for injuries of either sort.

After hearing Buckley's case, the District Court dismissed the action. The court found that Buckley did not "offer sufficient evidence to allow a jury to find that he suffered a real emotional injury." App. 623. And, in any event, Buckley suffered no "physical impact"; hence any emotional injury fell outside the limited set of circumstances in which, according to this Court, the FELA permits recovery. *Id.*, at 620; see *Consolidated Rail Corporation* v. *Gottshall*, 512 U. S. 532 (1994). The District Court did not discuss Buckley's further claim for the costs of medical monitoring.

Buckley appealed, and the Second Circuit reversed. 79 F. 3d 1337 (1996). Buckley's evidence, it said, showed that his contact with the insulation dust (containing asbestos) was "massive, lengthy, and tangible," *id.*, at 1345, and that the contact "would cause fear in a reasonable person," *id.*, at 1344. Under these circumstances, the court held, the contact was what this Court in *Gottshall* had called a "physical impact"—a "physical impact" that, when present, permits a FELA plaintiff to recover for accompanying emotional distress. The Second Circuit also found in certain of Buckley's workplace statements sufficient expression of worry to permit sending his emotional distress claim to a jury. Finally, the court held that Buckley could recover for the costs of medical checkups because the FELA permits recovery of all reasonably incurred extra medical monitoring costs whenever a "reasonable physician would prescribe . . . a monitoring regime different than the one that would have been prescribed in the absence of" a particular negligently caused exposure to a toxic substance. 79 F. 3d, at 1347 (internal quotation marks omitted).

We granted certiorari to review the Second Circuit's holdings in light of *Gottshall.*

## II

The critical question before us in respect to Buckley's "emotional distress" claim is whether the physical contact with insulation dust that accompanied his emotional distress

amounts to a "physical impact" as this Court used that term in *Gottshall*. In *Gottshall*, an emotional distress case, the Court interpreted the word "injury" in FELA § 1, a provision that makes "[e]very common carrier by railroad . . . liable in damages to any person suffering injury while . . . employed" by the carrier if the "injury" results from carrier "negligence." 45 U. S. C. § 51. In doing so, it initially set forth several general legal principles applicable here. *Gottshall* described FELA's purposes as basically "humanitarian." *Gottshall, supra,* at 542; see also, *e. g., Urie* v. *Thompson,* 337 U. S. 163 (1949). It pointed out that the Act expressly abolishes or modifies a host of common-law doctrines that previously had limited recovery. See, *e. g.,* 45 U. S. C. §§ 51, 53, and 54. It added that this Court has interpreted the Act's language "liberally" in light of its humanitarian purposes. *Gottshall, supra,* at 543. But, at the same time, the Court noted that liability under the Act rests upon "negligence" and that the Act does not make the railroad " 'the insurer' " for all employee injuries. 512 U. S., at 543 (quoting *Ellis* v. *Union Pacific R. Co.,* 329 U. S. 649, 653 (1947)). The Court stated that "common-law principles," where not rejected in the text of the statute, "are entitled to great weight" in interpreting the Act, and that those principles "play a significant role" in determining whether, or when, an employee can recover damages for "negligent infliction of emotional distress." 512 U. S., at 544. See also *id.,* at 558 (SOUTER, J., concurring) (Court's duty "in interpreting FELA . . . is to develop a federal common law of negligence . . . informed by reference to the evolving common law"); *Atchison, T. & S. F. R. Co.* v. *Buell,* 480 U. S. 557 (1987).

The Court also set forth several more specific legal propositions. It recognized that the common law of torts does not permit recovery for negligently inflicted emotional distress *unless* the distress falls within certain specific categories that amount to recovery-permitting exceptions. The law,

for example, does permit recovery for emotional distress where that distress accompanies a physical injury, see, *e. g., Simmons* v. *Pacor, Inc.,* 543 Pa. 664, 678, 674 A. 2d 232, 239 (1996); Restatement (Second) of Torts § 924(a) (1977), and it often permits recovery for distress suffered by a close relative who witnesses the physical injury of a negligence victim, *e. g., Dillon* v. *Legg,* 68 Cal. 2d 728, 441 P. 2d 912 (1968); *Gottshall,* 512 U. S., at 549, n. 10 (citing cases). The Court then held that FELA § 1, mirroring the law of many States, sometimes permitted recovery "for damages for negligent infliction of emotional distress," *id.,* at 550, and, in particular, it does so where a plaintiff seeking such damages satisfies the common law's "zone of danger" test. It defined that test by stating that the law permits "recovery for emotional injury" by

> "those plaintiffs who *sustain a physical impact* as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." *Id.,* at 547–548 (emphasis added).

The case before us, as we have said, focuses on the italicized words "physical impact." The Second Circuit interpreted those words as including a simple physical contact with a substance that might cause a disease at a future time, so long as the contact was of a kind that would "cause fear in a reasonable person." 79 F. 3d, at 1344. In our view, however, the "physical impact" to which *Gottshall* referred does not include a simple physical contact with a substance that might cause a disease at a substantially later time— where that substance, or related circumstance, threatens no harm other than that disease-related risk.

First, *Gottshall* cited many state cases in support of its adoption of the "zone of danger" test quoted above. And in each case where recovery for emotional distress was permitted, the case involved a threatened physical contact that caused, or might have caused, immediate traumatic harm.

*Keck* v. *Jackson*, 122 Ariz. 114, 593 P. 2d 668 (1979) (car accident); *Towns* v. *Anderson*, 195 Colo. 517, 579 P. 2d 1163 (1978) (gas explosion); *Robb* v. *Pennsylvania R. Co.*, 58 Del. 454, 210 A. 2d 709 (1965) (train struck car); *Rickey* v. *Chicago Transit Authority*, 98 Ill. 2d 546, 457 N. E. 2d 1 (1983) (clothing caught in escalator choked victim); *Shuamber* v. *Henderson*, 579 N. E. 2d 452 (Ind. 1991) (car accident); *Watson* v. *Dilts*, 116 Iowa 249, 89 N. W. 1068 (1902) (intruder assaulted plaintiff's husband); *Stewart* v. *Arkansas Southern R. Co.*, 112 La. 764, 36 So. 676 (1904) (train accident); *Purcell* v. *St. Paul City R. Co.*, 48 Minn. 134, 50 N. W. 1034 (1892) (near streetcar collision); *Bovsun* v. *Sanperi*, 61 N. Y. 2d 219, 461 N. E. 2d 843 (1984) (car accident); *Kimberly* v. *Howland*, 143 N. C. 398, 55 S. E. 778 (1906) (rock from blasting crashed through plaintiffs' residence); *Simone* v. *Rhode Island Co.*, 28 R. I. 186, 66 A. 202 (1907) (streetcar collision); *Mack* v. *South-Bound R. Co.*, 52 S. C. 323, 29 S. E. 905 (1898) (train narrowly missed plaintiff); *Gulf, C. & S. F. R. Co.* v. *Hayter*, 93 Tex. 239, 54 S. W. 944 (1900) (train collision); *Pankopf* v. *Hinkley*, 141 Wis. 146, 123 N. W. 625 (1909) (automobile struck carriage); *Garrett* v. *New Berlin*, 122 Wis. 2d 223, 362 N. W. 2d 137 (1985) (car accident). Cf. *Deutsch* v. *Shein*, 597 S. W. 2d 141 (Ky. 1980) (holding that exposure to X rays was "physical contact" supporting recovery for emotional suffering where immediate physical harm to fetus was suspected).

Second, *Gottshall's* language, read in light of this precedent, seems similarly limited. 512 U. S., at 555 ("zone of danger test . . . is consistent with FELA's central focus on physical perils"); *id.*, at 556 (quoting *Lancaster* v. *Norfolk & Western R. Co.*, 773 F. 2d 807, 813 (CA7 1985)) (FELA seeks to protect workers " 'from physical invasions or menaces' "), cert. denied, 480 U. S. 945 (1987); 512 U. S., at 556 (employer should be liable for "emotional injury caused by the apprehension of physical impact"); *id.*, at 547–548 (quoting Pearson, Liability to Bystanders for Negligently Inflicted Emotional Harm—A Comment on the Nature of Arbitrary Rules,

34 U. Fla. L. Rev. 477, 488–489 (1982)) (" '[T]hose within the zone of danger of physical impact'" should be able to " 're-cover for fright'" because " 'a near miss may be as frighten-ing as a direct hit'").

Taken together, language and cited precedent indicate that the words "physical impact" do not encompass every form of "physical contact." And, in particular, they do not include a contact that amounts to no more than an exposure—an exposure, such as that before us, to a substance that poses some future risk of disease and which contact causes emo-tional distress only because the worker learns that he may become ill after a substantial period of time.

Third, common-law precedent does not favor the plaintiff. Common-law courts do permit a plaintiff who suffers from a disease to recover for related negligently caused emotional distress, see *supra*, at 429, and some courts permit a plaintiff who exhibits a physical symptom of exposure to recover, see, *e. g., Herber* v. *Johns-Manville Corp.*, 785 F. 2d 79, 85 (CA3 1986); *Mauro* v. *Owens-Corning Fiberglas Corp.*, 225 N. J. Super. 196, 542 A. 2d 16 (App. Div. 1988). But with only a few exceptions, common-law courts have denied recovery to those who, like Buckley, are disease and symptom free. *E. g., Burns* v. *Jacquays Mining Corp.*, 156 Ariz. 375, 752 P. 2d 28 (Ct. App. 1987), review dism'd, 162 Ariz. 186, 781 P. 2d 1373 (1989); *Mergenthaler* v. *Asbestos Corp. of Am.*, 480 A. 2d 647 (Del. 1984); *Eagle-Picher Industries, Inc.* v. *Cox*, 481 So. 2d 517 (Fla. App. 1985), review denied, 492 So. 2d 1331 (Fla. 1986); *Capital Holding Corp.* v. *Bailey*, 873 S. W. 2d 187 (Ky. 1994); *Payton* v. *Abbott Labs*, 386 Mass. 540, 437 N. E. 2d 171 (1982); *Simmons* v. *Pacor, Inc.*, 543 Pa. 664, 674 A. 2d 232 (1996); *Ball* v. *Joy Technologies, Inc.*, 958 F. 2d 36 (CA4 1991); *Deleski* v. *Raymark Industries, Inc.*, 819 F. 2d 377 (CA3 1987) (Pennsylvania and New Jersey law); *Adams* v. *Johns-Manville Sales Corp.*, 783 F. 2d 589 (CA5 1986) (Loui-siana law); *Wisniewski* v. *Johns-Manville Corp.*, 759 F. 2d 271 (CA3 1985) (Pennsylvania law); *In re Hawaii Federal*

*Asbestos Cases,* 734 F. Supp. 1563 (Haw. 1990) (Hawaii law); *Amendola* v. *Kansas City So. R. Co.,* 699 F. Supp. 1401 (WD Mo. 1988) (FELA); see also *Potter* v. *Firestone Tire & Rubber Co.,* 6 Cal. 4th 965, 863 P. 2d 795 (1993) (in banc) (no recovery for fear of cancer in a negligence action unless plaintiff is "more likely than not" to develop cancer).

Fourth, the general policy reasons to which *Gottshall* referred—in its explanation of why common-law courts have restricted recovery for emotional harm to cases falling within rather narrowly defined categories—militate against an expansive definition of "physical impact" here. Those reasons include: (a) special "difficult[y] for judges and juries" in separating valid, important claims from those that are invalid or "trivial," *Gottshall,* 512 U. S., at 557; (b) a threat of "unlimited and unpredictable liability," *ibid.;* and (c) the "potential for a flood" of comparatively unimportant, or "trivial," claims, *ibid.*

To separate meritorious and important claims from invalid or trivial claims does not seem easier here than in other cases in which a plaintiff might seek recovery for typical negligently caused emotional distress. The facts before us illustrate the problem. The District Court, when concluding that Buckley had failed to present "sufficient evidence to allow a jury to find . . . a real emotional injury," pointed out that, apart from Buckley's own testimony, there was virtually no evidence of distress. App. 623–625. Indeed, Buckley continued to work with insulating material "even though . . . he could have transferred" elsewhere, he "continued to smoke cigarettes" despite doctors' warnings, and his doctor did not refer him "either to a psychologist or to a social worker." *Id.,* at 624. The Court of Appeals reversed because it found certain objective corroborating evidence, namely, "workers' complaints to supervisors and investigative bodies." 79 F. 3d, at 1346. Both kinds of "objective" evidence—the confirming and disconfirming evidence—seem only indirectly related to the question at issue, the existence

and seriousness of Buckley's claimed emotional distress. Yet, given the difficulty of separating valid from invalid emotional injury claims, the evidence before us may typify the kind of evidence to which parties and the courts would have to look.

The Court in *Gottshall* made a similar point:

"[T]esting for the 'genuineness' of an injury alone . . . would be bound to lead to haphazard results. Judges would be forced to make highly subjective determinations concerning the authenticity of claims for emotional injury, which are far less susceptible to objective medical proof than are their physical counterparts. To the extent the genuineness test could limit potential liability, it could do so only inconsistently." 512 U. S., at 552.

And JUSTICE GINSBURG, too, in her opinion concurring in the judgment in part and dissenting in part, seems to recognize this problem, for she would limit recovery in emotional injury cases to those who can show more objective evidence than simply having expressed fear and concern to supervisors. See *post*, at 445.

More important, the physical contact at issue here—a simple (though extensive) contact with a carcinogenic substance—does not seem to offer much help in separating valid from invalid emotional distress claims. That is because contacts, even extensive contacts, with serious carcinogens are common. See, *e. g.*, Nicholson, Perkel, & Selikoff, Occupational Exposure to Asbestos: Population at Risk and Projected Mortality—1980–2030, 3 Am. J. Indust. Med. 259 (1982) (estimating that 21 million Americans have been exposed to work-related asbestos); U. S. Dept. of Health and Human Services, 1 Seventh Annual Report on Carcinogens 71 (1994) (3 million workers exposed to benzene, a majority of Americans exposed outside the workplace); Pirkle, et al., Exposure of the U S Population to Environmental Tobacco Smoke, 275 JAMA 1233, 1237 (1996) (reporting that 43% of

American children lived in a home with at least one smoker, and 37% of adult nonsmokers lived in a home with at least one smoker or reported environmental tobacco smoke at work). They may occur without causing serious emotional distress, but sometimes they do cause distress, and reasonably so, for cancer is both an unusually threatening and unusually frightening disease. See Statistical Abstract of United States 94 (1996) (23.5% of Americans who died in 1994 died of cancer); American Cancer Society, Cancer Facts & Figures—1997, p. 1 (half of all men and one-third of all women will develop cancer). The relevant problem, however, remains one of evaluating a claimed emotional reaction to an *increased* risk of dying. An external circumstance—exposure—makes some emotional distress more likely. But how can one determine from the external circumstance of exposure whether, or when, a claimed strong emotional reaction to an *increased* mortality risk (say, from 23% to 28%) is reasonable and genuine, rather than overstated—particularly when the relevant statistics themselves are controversial and uncertain (as is usually the case), and particularly since neither those exposed nor judges or juries are experts in statistics? The evaluation problem seems a serious one.

The large number of those exposed and the uncertainties that may surround recovery also suggest what *Gottshall* called the problem of "unlimited and unpredictable liability." Does such liability mean, for example, that the costs associated with a rule of liability would become so great that, given the nature of the harm, it would seem unreasonable to require the public to pay the higher prices that may result? Cf. Priest, The Current Insurance Crisis and Modern Tort Law, 96 Yale L. J. 1521, 1585–1587 (1987). The same characteristics further suggest what *Gottshall* called the problem of a "flood" of cases that, if not "trivial," are comparatively less important. In a world of limited resources, would a rule permitting immediate large-scale recoveries for widespread emotional distress caused by fear of future disease

diminish the likelihood of recovery by those who later suffer from the disease? Cf. J. Weinstein, Individual Justice in Mass Tort Litigation 10–11, 141 (1995); Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, 15 Harv. J. L. & Pub. Pol'y 541 (1992).

We do not raise these questions to answer them (for we do not have the answers), but rather to show that general policy concerns of a kind that have led common-law courts to deny recovery for certain classes of negligently caused harms are present in this case as well. That being so, we cannot find in *Gottshall*'s underlying rationale any basis for departing from *Gottshall*'s language and precedent or from the current common-law consensus. That is to say, we cannot find in *Gottshall*'s language, cited precedent, other common-law precedent, or related concerns of policy a legal basis for adopting the emotional distress recovery rule adopted by the Court of Appeals.

Buckley raises several important arguments in reply. He points out, for example, that common-law courts do permit recovery for emotional distress where a plaintiff has physical symptoms; and he argues that his evidence of exposure and enhanced mortality risk is as strong a proof as an accompanying physical symptom that his emotional distress is genuine.

This argument, however, while important, overlooks the fact that the common law in this area does not examine the genuineness of emotional harm case by case. Rather, it has developed recovery-permitting categories the contours of which more distantly reflect this, and other, abstract general policy concerns. The point of such categorization is to deny courts the authority to undertake a case-by-case examination. The common law permits emotional distress recovery for that category of plaintiffs who suffer from a disease (or exhibit a physical symptom), for example, thereby finding a special effort to evaluate emotional symptoms warranted in that category of cases—perhaps from a desire to make a

physically injured victim whole or because the parties are likely to be in court in any event. In other cases, however, falling outside the special recovery-permitting categories, it has reached a different conclusion. The relevant question here concerns the validity of a rule that seeks to redefine such a category. It would not be easy to redefine "physical impact" in terms of a rule that turned on, say, the "massive, lengthy, [or] tangible" nature of a contact that amounted to an exposure, whether to contaminated water, or to germ-laden air, or to carcinogen-containing substances, such as insulation dust containing asbestos. But, in any event, for the reasons we have stated, *supra*, at 430–436, we cannot find that the common law has done so.

Buckley also points to a series of common-law cases that he believes offer him support. Many of these cases, however, find that the plaintiff at issue fell within a category where the law already permitted recovery for emotional distress. *E. g., Marchica* v. *Long Island R. Co.*, 31 F. 3d 1197 (CA2 1994) (traumatic injury); *Clark* v. *Taylor*, 710 F. 2d 4 (CA1 1983) (intentional infliction of harm); *Laxton* v. *Orkin Exterminating Co.*, 639 S. W. 2d 431, 433–434 (Tenn. 1982) (nuisance claim); *Lavelle* v. *Owens-Corning Fiberglas Corp.*, 30 Ohio Misc. 2d 11, 507 N. E. 2d 476 (Ct. Common Pleas, Cayahoga Cty. 1987) (emotional distress damages sought by asbestosis-afflicted plaintiff). We have found only three asbestos-related cases, all involving state law, that support Buckley directly. *Watkins* v. *Fibreboard Corp.*, 994 F. 2d 253, 259 (CA5 1993) (Texas law) (recognizing cause of action for emotional distress based on exposures to asbestos in the absence of physical symptoms); *In re Moorenovich*, 634 F. Supp. 634 (Me. 1986) (Maine law) (same); *Gerardi* v. *Nuclear Utility Services, Inc.*, 149 Misc. 2d 657, 566 N. Y. S. 2d 1002 (Westchester Cty. 1991) (same). None of them was decided by the highest court of the relevant State. And we do not find that minority view a sufficient basis for reaching Buckley's proposed conclusion.

Finally, Buckley argues that the "humanitarian" nature of the FELA warrants a holding in his favor. We do not doubt that the FELA's purpose militates in favor of recovery for a serious and negligently caused emotional harm. Cf. *Gottshall*, 512 U. S., at 550. But just as courts must interpret that law to take proper account of the harms suffered by a sympathetic individual plaintiff, so they must consider the general impact, on workers as well as employers, of the general liability rules they would thereby create. Here the relevant question concerns not simply recovery in an individual case, but the consequences and effects of *a rule of law that would permit that recovery.* And if the common law concludes that a legal rule permitting recovery here, from a tort law perspective, and despite benefits in *some* individual cases, would on balance cause more harm than good, and if we find that judgment reasonable, we cannot find that conclusion inconsistent with the FELA's humanitarian purpose.

## III

Buckley also sought recovery for a different kind of "injury," namely, the economic cost of the extra medical checkups that he expects to incur as a result of his exposure to asbestos-laden insulation dust. The District Court, when it dismissed the action, did not discuss this aspect of Buckley's case. But the Second Circuit, when reversing the District Court, held that "a reasonable jury could award" Buckley the "costs" of "medical monitoring" in this case. 79 F. 3d, at 1347. We agreed to decide whether the court correctly found that the FELA permitted a plaintiff without symptoms or disease to recover this economic loss.

The parties do not dispute—and we assume—that an exposed plaintiff can recover related reasonable medical monitoring costs if and when he develops symptoms. As the Second Circuit pointed out, a plaintiff injured through negligence can recover related reasonable medical expenses as an element of damages. *Ibid.* (citing C. McCormick, Law of

Damages § 90 (1935)); see also Restatement (Second) of Torts § 924(c) (1977); J. Stein, Stein on Personal Injury Damages § 5.18 (2d ed. 1991). No one has argued that any different principle would apply in the case of a plaintiff whose "injury" consists of a disease, a symptom, or those sorts of emotional distress that fall within the FELA's definition of "injury." See Part II, *supra.* Much of the Second Circuit's opinion suggests it intended only to apply this basic principle of the law of damages. See, *e. g.,* 79 F. 3d, at 1342 ("[T]his case turns upon whether . . . emotional harm . . . is an injury compensable under FELA"); *id.,* at 1347 (monitoring costs are a "traditional element of tort damages"). Insofar as that is so, Part II of our opinion, holding that the emotional distress at issue here is not a compensable "injury," requires reversal on this point as well.

Other portions of the Second Circuit's opinion, however, indicate that it may have rested this portion of its decision upon a broader ground, namely, that medical monitoring costs themselves represent a separate negligently caused economic "injury," 45 U. S. C. § 51, for which a negligently exposed FELA plaintiff (including a plaintiff without disease or symptoms) may recover to the extent that the medical monitoring costs that a reasonable physician would prescribe for the plaintiff exceed the medical monitoring costs that "would have been prescribed in the absence of [the] exposure." 79 F. 3d, at 1347 (citation omitted). This portion of the opinion, when viewed in light of Buckley's straightforward claim for an "amount of money" sufficient to "compensate" him for "future medical monitoring expenses," Plaintiff's Proposed Charges to the Jury 25, Record, Doc. 33, suggests the existence of an ordinary, but separate, tort law cause of action permitting (as tort law ordinarily permits) the recovery of medical cost damages in the form of a lump sum, see Stein, *supra,* at §§ 5.1 and 5.18, and irrespective of insurance, Restatement (Second) of Torts, *supra,* § 920A(2). As so characterized, the Second Circuit's holding, in our

view, went beyond the bounds of currently "evolving common law." *Gottshall, supra,* at 558 (SOUTER, J., concurring).

Guided by the parties' briefs, we have canvassed the state-law cases that have considered whether the negligent causation of this kind of harm (*i. e.,* causing a plaintiff, through negligent exposure to a toxic substance, to incur medical monitoring costs) by itself constitutes a sufficient basis for a tort recovery. We have found no other FELA decisions. We have put to the side several cases that involve special recovery-permitting circumstances, such as the presence of a traumatic physical impact, or the presence of a physical symptom, which for reasons explained in Part II are important but beside the point here. See, *e. g., Friends for All Children, Inc.* v. *Lockheed Aircraft Corp.,* 746 F. 2d 816, 824–825 (CADC 1984) (traumatic impact); *Hagerty* v. *L & L Marine Services, Inc.,* 788 F. 2d 315, modified, 797 F. 2d 256 (CA5 1986) (same); *Simmons* v. *Pacor, Inc.,* 543 Pa. 664, 674 A. 2d 232 (1996) (physical symptom). We have noted that federal courts, interpreting state law, have come to different conclusions about the matter. Compare, *e. g., In re Paoli R. Yard PCB Litigation,* 916 F. 2d 829 (CA3 1990) (Pennsylvania law), with *Ball* v. *Joy Technologies, Inc.,* 958 F. 2d 36 (CA4 1991) (West Virginia and Virginia law). And we have ended up focusing on several important State Supreme Court cases that have permitted recovery. *Ayers* v. *Jackson,* 106 N. J. 557, 525 A. 2d 287 (1987); *Hansen* v. *Mountain Fuel Supply Co.,* 858 P. 2d 970 (Utah 1993); *Potter* v. *Firestone Tire & Rubber Co.,* 6 Cal. 4th 965, 863 P. 2d 795 (1993); see also *Burns* v. *Jacquays Mining Corp.,* 156 Ariz. 375, 752 P. 2d 28 (App. 1987).

We find it sufficient to note, for present purposes, that the cases authorizing recovery for medical monitoring in the absence of physical injury do not endorse a full-blown, traditional tort law cause of action for lump-sum damages—of the sort that the Court of Appeals seems to have endorsed here. Rather, those courts, while recognizing that medical monitoring costs can amount to a harm that justifies a tort

remedy, have suggested, or imposed, special limitations on that remedy. Compare *Ayers, supra,* at 608, 525 A. 2d, at 314 (recommending in future cases creation of "a court-supervised fund to administer medical-surveillance payments"); *Hansen, supra,* at 982 (suggesting insurance mechanism or court-supervised fund as proper remedy); *Potter, supra,* at 1010, n. 28, 863 P. 2d, at 825, n. 28 (suggesting that a lump-sum damages award would be inappropriate); *Burns, supra,* at 381, 752 P. 2d, at 34 (holding that lump-sum damages are not appropriate), with, *e. g., Honeycutt* v. *Walden,* 294 Ark. 440, 743 S. W. 2d 809 (1988) (damages award for future medical expenses made necessary by physical injury are awarded as lump-sum payment); *Rice* v. *Hill,* 315 Pa. 166, 172 A. 289 (1934) (same); and Restatement (Second) of Torts § 920A(2) (1977) (ordinarily fact that plaintiff is insured is irrelevant to amount of tort recovery). Cf. Weinstein, Individual Justice in Mass Tort Litigation, at 154. We believe that the note of caution, the limitations, and the expressed uneasiness with a traditional lump-sum damages remedy are important, for they suggest a judicial recognition of some of the policy concerns that have been pointed out to us here—concerns of a sort that *Gottshall* identified.

Since, for example, the particular cancer-related costs at issue are the *extra* monitoring costs, over and above those otherwise recommended, their identification will sometimes pose special "difficult[ies] for judges and juries." *Gottshall,* 512 U. S., at 557. Those difficulties in part can reflect uncertainty among medical professionals about just which tests are most usefully administered and when. Cf. Report of U. S. Preventive Services Task Force, Guide to Clinical Preventive Services xxvii, xxx–xxxi, xlvii–xcii (2d ed. 1996). And in part those difficulties can reflect the fact that scientists will not always see a medical need to provide systematic *scientific* answers to the relevant *legal* question, namely, whether an exposure calls for *extra* monitoring. Cf. App. 182 (testimony by Buckley's expert conceding that periodic colon cancer screening "is recommended by the American

Cancer Society anyway"); *id.*, at 164 (testimony by Buckley's expert declining to rule out that periodic chest X rays would likely benefit smokers such as Buckley, even in the absence of asbestos exposure). Buckley's sole expert, then, was equivocal about the need for *extra* monitoring, and the defense had not yet put on its case.

Moreover, tens of millions of individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring. See *supra*, at 434–435. (The dissent limits its class of potential plaintiffs to employees suing their employers, see *post*, at 454, but other exposed individuals who satisfy the *Paoli* test, see *post*, at 449–450, could sue—at common law.) And that fact, along with uncertainty as to the amount of liability, could threaten both a "flood" of less important cases (potentially absorbing resources better left available to those more seriously harmed, see *supra*, at 435–436) and the systemic harms that can accompany "unlimited and unpredictable liability" (for example, vast testing liability adversely affecting the allocation of scarce medical resources). The dissent assumes that medical monitoring is not a "costly" remedy, see *post*, at 451 (internal quotation marks omitted). But Buckley here sought damages worth $950 annually for 36 years; by comparison, of all claims settled by the Center for Claims Resolution, a group representing asbestos manufacturers, from 1988 until 1993, the average settlement for plaintiffs *injured* by asbestos was about $12,500, and the settlement for nonmalignant plaintiffs among this group averaged $8,810. See App. in *Amchem Products, Inc.* v. *Windsor,* O. T. 1996, No. 96–270, p. 578.

Finally, a traditional, full-blown ordinary tort liability rule would ignore the presence of existing alternative sources of payment, thereby leaving a court uncertain about how much of the potentially large recoveries would pay for otherwise unavailable medical testing and how much would accrue to plaintiffs for whom employers or other sources (say, insurance now or in the future) might provide monitoring in any

event. Cf. 29 CFR § 1910.1001(l) (1996) (requiring employers to provide medical monitoring for workers exposed to asbestos). The Occupational Safety and Health Administration regulations (which the dissent cites) help to demonstrate why the Second Circuit erred: where state and federal regulations already provide the relief that a plaintiff seeks, creating a full-blown tort remedy could entail systemic costs without corresponding benefits. Nor could an employer necessarily protect itself by offering monitoring, see *post,* at 453–454, for that is not part of the rule of law that JUSTICE GINSBURG would endorse—a rule that, if traditional, would, as we have noted, allow recovery irrespective of the presence of a "collateral source" of payment. See *post,* at 449.

We do not deny important competing considerations—of a kind that may have led some courts to provide a form of liability. Buckley argues, for example, that it is inequitable to place the economic burden of such care on the negligently exposed plaintiff rather than on the negligent defendant. See, *e. g., Ayers,* 106 N. J., at 603–606, 525 A. 2d, at 311–312; *Potter,* 6 Cal. 4th, at 1007–1009, 863 P. 2d, at 824. He points out that providing preventive care to individuals who would otherwise go without can help to mitigate potentially serious future health effects of diseases by detecting them in early stages; again, whether or not this is such a situation, we may assume that such situations occur. And he adds that, despite scientific uncertainties, the difficulty of separating justified from unjustified claims may be less serious than where emotional distress is the harm at issue. See also *Ayers, supra; Potter, supra.*

We do not deny that JUSTICE GINSBURG paints a sympathetic picture of Buckley and his co-workers; this picture has force because Buckley *is* sympathetic and he *has* suffered wrong at the hands of a negligent employer. But we are more troubled than is JUSTICE GINSBURG by the potential systemic effects of creating a new, full-blown, tort law cause of action—for example, the effects upon interests of other

potential plaintiffs who are not before the court and who depend on a tort system that can distinguish between reliable and serious claims on the one hand, and unreliable and relatively trivial claims on the other. See *supra,* at 438. The reality is that competing interests are at stake—and those interests sometimes can be reconciled in ways other than simply through the creation of a full-blown, traditional, tort law cause of action. Cf. *post,* at 454.

We have not tried to balance these, or other, competing considerations here. We point them out to help explain why we consider the limitations and cautions to be important—and integral—parts of the state-court decisions that permit asymptomatic plaintiffs a separate tort claim for medical monitoring costs. That being so, we do not find sufficient support in the common law for the unqualified rule of lump-sum damages recovery that is, at least arguably, before us here. And given the mix of competing general policy considerations, plaintiff's policy-based arguments do not convince us that the FELA contains a tort liability rule of that *unqualified* kind.

This limited conclusion disposes of the matter before us. We need not, and do not, express any view here about the extent to which the FELA might, or might not, accommodate medical cost recovery rules more finely tailored than the rule we have considered.

### IV

For the reasons stated, we reverse the determination of the Second Circuit, and we remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE STEVENS joins, concurring in the judgment in part and dissenting in part.

The Federal Employers' Liability Act (FELA) was enacted to facilitate recovery for railworkers who suffer injuries as a result of their employers' negligence. "Congress intended

the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its workers." *Kernan* v. *American Dredging Co.*, 355 U. S. 426, 432 (1958). Until recently, this Court accorded the FELA a notably "liberal construction in order to accomplish [Congress'] objects." *Urie* v. *Thompson*, 337 U. S. 163, 180 (1949). Today's decision, however, continues the step-back approach taken in *Consolidated Rail Corporation* v. *Gottshall*, 512 U. S. 532 (1994). Even if the *Gottshall* decision supported the Court's rejection of Michael Buckley's claim for emotional distress, the Court's disposition of Buckley's medical monitoring claim marks a new and enigmatic departure from a once "constant and established course." *Urie*, 337 U. S., at 181–182.

Buckley's extensive contact with asbestos particles in Grand Central's tunnels, as I comprehend his situation, constituted "physical impact" as that term was used in *Gottshall*. Nevertheless, I concur in the Court's judgment with respect to Buckley's emotional distress claim. In my view, that claim fails because Buckley did not present objective evidence of severe emotional distress. See *Atchison, T. & S. F. R. Co.* v. *Buell*, 480 U. S. 557, 566–567, n. 13 (1987) ("severe emotional injury . . . has generally been required to establish liability for purely emotional injury"); see also *id.*, at 569, n. 18. Buckley testified at trial that he was angry at Metro-North and fearful of developing an asbestos-related disease. However, he sought no professional help to ease his distress, and presented no medical testimony concerning his mental health. See 79 F. 3d 1337, 1341 (CA2 1996). Under these circumstances, Buckley's emotional distress claim fails as a matter of law. Cf. *Gottshall*, 512 U. S., at 563–564, 566–567 (GINSBURG, J., dissenting) (describing as "unquestionably genuine and severe" emotional distress suffered by one respondent who had a nervous breakdown, and another who was hospitalized, lost weight, and had, *inter alia*, suicidal preoccupations, anxiety, insomnia, cold sweats, and nausea).

Concerning medical monitoring, the Court of Appeals ruled that Buckley stated a triable claim for monitoring expenses made "necessary because of his exposure to asbestos," expenses essential "to ensure early detection and cure of any asbestos-related disease he develops." 79 F. 3d, at 1347. I would not disturb that ruling.

I

As a pipefitter for Metro-North, Michael Buckley repaired and maintained the labyrinth of pipes in the steam tunnels of Grand Central Terminal in New York City. The pipes were surrounded by a white insulation material that Buckley and his co-workers had to remove to perform their jobs. Without any protective gear, the pipefitters would hammer, slice, and pull the insulation material, which broke apart as it was removed, scattering dust particles into the air. Fans used to mitigate the intense heat of the steam tunnels spread further dust from insulation pieces that had accumulated on tunnel floors. The dust coated Buckley's skin and clothing; he testified that he could taste the gritty insulation material as it entered his mouth and nose. The pipefitters would emerge from their work in the tunnels covered from head to toe with white dust; for this appearance, they were dubbed "the snowmen of Grand Central."

The insulation material covering Grand Central's pipes was made of asbestos, widely recognized as a carcinogen since the mid-1970's. Metro-North did not tell the pipefitters of, or provide protection against, the danger to which the workers were exposed until 1987, two years after Buckley started working in the steam tunnels. At an asbestos awareness class on August 31, 1987, Buckley and his co-workers learned of the asbestos in the pipe insulation and of the diseases asbestos exposure could cause. Buckley was then given a respirator and some instruction on the "glove bag" method of removing asbestos. He testified that his efforts to use the respirator and glove bag method proved frus-

trating: the respirator fit poorly and slid down his face as he perspired in the intense heat of the steam tunnels; the plastic bags used to isolate the asbestos melted on the hot pipes, spilling out the material instead of containing it.

Buckley and as many as 140 other asbestos-exposed workers sought legal counsel after their complaints to Metro-North management went unresolved. In the FELA action now before us, Buckley is serving as test plaintiff for the claims of all the exposed employees. Metro-North stipulated in the District Court that it had "negligently exposed the plaintiff Michael Buckley to asbestos while he was working in Grand Central Terminal from June 1985 to the beginning of September 1987." App. 594 (Admitted and Stipulated Facts). "[N]o later than 1986," Metro-North also conceded, "[it] obtained actual notice of the presence of asbestos in Grand Central Terminal and notice of the hazard that working with or around asbestos posed to the health and welfare of its employees." *Ibid.* Metro-North further acknowledged that "it exposed the plaintiff to asbestos without warning him that he was being exposed to asbestos and without training him how to safely handle and remove asbestos." *Ibid.* Prior to Metro-North's stipulation conceding negligence, the New York Attorney General's Office and the Office of the Inspector General of the Metropolitan Transportation Authority conducted a joint investigation, leading to these conclusions: Metro-North had "seriously disregarded the health and safety of its workers"; and the railroad's failings were "particularly egregious" because Metro-North was on notice of the asbestos problem as a result of complaints by its workers, a report by its own consultant, and inspections by the New York State Department of Labor. *Id.,* at 614.

## II

Buckley asserted two claims for relief in his FELA-based complaint: first, he charged Metro-North with negligent infliction of emotional distress; second, he sought compensation

for the cost of future medical monitoring. The Court definitively rejects Buckley's first claim by holding that, under the FELA, a railworker may not recover damages for emotional distress unless, and until, he manifests symptoms of a disease. See *ante,* at 427, 430. As to Buckley's second claim, however, the Court speaks tentatively. "[T]he respondent in this case," we are told, "has not shown that he is legally entitled to recover [medical monitoring] costs." *Ante,* at 427. "[A]rguably," the Court explains, Buckley demands an "unqualified rule of lump-sum damages recovery," *ante,* at 444, a rule for which the Court finds "[in]sufficient support in the common law," *ibid.* The Court pointedly refrains, however, from "express[ing] any view . . . about the extent to which the FELA might, or might not, accommodate medical cost recovery rules more finely tailored than" a "rule of [the] *unqualified* kind." *Ibid.* (emphasis in original).

It is not apparent why (or even whether) the Court reverses the Second Circuit's determination on Buckley's second claim. The Court of Appeals held that a medical monitoring claim is solidly grounded, and this Court does not hold otherwise. Hypothesizing that Buckley demands lump-sum damages and nothing else, the Court ruminates on the appropriate remedy without answering the anterior question: Does the plaintiff have a claim for relief? Buckley has shown that Metro-North negligently exposed him to "extremely high levels of asbestos," 79 F. 3d, at 1341, and that this exposure warrants "medical monitoring in order to detect and treat [asbestos-related] diseases as they may arise." *Id.,* at 1346. Buckley's expert medical witness estimated the annual costs of proper monitoring at $950. *Ibid.*[1] We do not know from the Court's opinion what more a plaintiff must show to qualify for relief.

---

[1] Metro-North, of course, could contest that estimate as excessive. But the amount Buckley may recover is a matter discrete from the question whether he has stated a claim for relief.

### A

In my view, the Second Circuit rightly held that a railworker negligently exposed to asbestos states a claim for relief under the FELA; recovery in such cases, again as the Court of Appeals held, should reflect the difference in cost between the medical tests a reasonable physician would prescribe for unexposed persons and the monitoring regime a reasonable physician would advise for persons exposed in the way Michael Buckley and his co-workers were. See *id.*, at 1347; see *infra*, at 450–451 (defining an asbestos-exposed worker's "injury"); see also *In re Paoli R. Yard PCB Litigation*, 916 F. 2d 829, 849–852 (CA3 1990) *(Paoli I)*, cert. denied *sub nom. General Elec. Co.* v. *Knight*, 499 U. S. 961 (1991); *In re Paoli R. Yard PCB Litigation*, 35 F. 3d 717, 785–788 (CA3 1994) *(Paoli II)*, cert. denied *sub nom. General Elec. Co.* v. *Ingram*, 513 U. S. 1190 (1995).

Recognizing such a claim would align the FELA with the "evolving common law." *Gottshall*, 512 U. S., at 558 (SOUTER, J., concurring). "[A medical monitoring] action has been increasingly recognized by state courts as necessary given the latent nature of many diseases caused by exposure to hazardous materials and the traditional common law tort doctrine requirement that an injury be manifest." *Daigle* v. *Shell Oil Co.*, 972 F. 2d 1527, 1533 (CA10 1992); see also Schwartz, Recovery of Damages for Expense of Medical Monitoring to Detect or Prevent Future Disease or Condition, 17 A. L. R. 5th 327 (1994). As the Court understates, several state high courts have upheld medical monitoring cost recovery. See *ante*, at 440. In a pathmarking opinion, the United States Court of Appeals for the Third Circuit, interpreting Pennsylvania law, recognized a right to compensation for monitoring "necessary in order to diagnose properly the warning signs of disease." See *Paoli I*, 916 F. 2d, at 851; see also *Paoli II*, 35 F. 3d, at 785–788. Similarly, a number of Federal District Courts interpreting state law, and several state courts of first and second instance, have

sustained medical monitoring claims.[2]  This Court, responsible for developing FELA law, finds little value in these decisions.

These courts have answered the question this Court passes by: What are the elements of a compensable medical monitoring claim?  The Third Circuit, for example, has enumerated: A plaintiff can recover the costs of medical monitoring if (1) he establishes that he was significantly exposed to a proven hazardous substance through the negligent actions of the defendant; (2) as a proximate result of the exposure, the plaintiff suffers a significantly increased risk of contracting a serious latent disease; (3) by reason of the exposure a reasonable physician would prescribe a monitoring regime different from the one that would have been prescribed in the absence of the exposure; and (4) monitoring and testing procedures exist that make the early detection and treatment of the disease possible and beneficial.  See *Paoli I,* 916 F. 2d, at 852; *Paoli II,* 35 F. 3d, at 788.  Each factor must be shown by competent expert testimony.  See *Paoli I,* 916 F. 2d, at 852.

A claim so defined comports with the terms of the FELA. Under the FELA, a railroad "shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier."  45 U. S. C. § 51.  The "injury" sustained by an asbestos-exposed worker seeking to recover medical monitoring costs is the invasion of that employee's interest in being free from the economic burden of extraordi-

---

[2] The state court cases include: *Elam* v. *Alcolac, Inc.,* 765 S. W. 2d 42, 208–209 (Mo. App. 1988); *Askey* v. *Occidental Chemical Corp.,* 477 N. Y. S. 2d 242, 246–247 (App. Div. 1984).  The Federal District Court cases include: *Day* v. *National Lead of Ohio,* 851 F. Supp. 869, 880–882 (SD Ohio 1994); *Bocook* v. *Ashland Oil, Inc.,* 819 F. Supp. 530, 536 (SD W. Va. 1993); *Stead* v. *F. E. Myers Co., Div. of McNeil Corp.,* 785 F. Supp. 56, 57 (Vt. 1990).

nary medical surveillance. See Restatement (Second) of Torts § 7 (1964) (defining injury as "the invasion of any legally protected interest of another"); see *Friends for All Children, Inc.* v. *Lockheed Aircraft Corp.*, 746 F. 2d 816, 826 (CADC 1984) ("It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury."); *Ayers* v. *Jackson*, 106 N. J. 557, 591, 525 A. 2d 287, 304 (1987).

Traditional tort principles upon which the FELA rests warrant recognition of medical monitoring claims of the kind Buckley has asserted. As the Third Circuit explained, "[t]he policy reasons for recognizing this tort are obvious[:]"

> "Medical monitoring claims acknowledge that, in a toxic age, significant harm can be done to an individual by a tortfeasor, notwithstanding latent manifestation of that harm. Moreover, . . . recognizing this tort does not require courts to speculate about the probability of future injury. It merely requires courts to ascertain the probability that the far less costly remedy of medical supervision is appropriate. Allowing plaintiffs to recover the cost of this care deters irresponsible discharge of toxic chemicals by defendants and encourages plaintiffs to detect and treat their injuries as soon as possible. These are conventional goals of the tort system . . . ." *Paoli I*, 916 F. 2d, at 852.

See also *Potter* v. *Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1008, 863 P. 2d 795, 824 (1993); *Hansen* v. *Mountain Fuel Supply Co.*, 858 P. 2d 970, 976–978 (Utah 1993); *Ayers*, 106 N. J., at 603–605, 525 A. 2d, at 311–312; *Burns* v. *Jaquays Mining Corp.*, 156 Ariz. 375, 380–381, 752 P. 2d 28, 33–34 (App. 1987).

On all counts—exposure, increased risk of devastating disease, and the necessity of monitoring—Michael Buckley's complaint presents a textbook case. Through its stipula-

tions, Metro-North has acknowledged that it failed "to use [the] reasonable care [the FELA requires] in furnishing its employees with a safe place to work." *Buell*, 480 U. S., at 558. At trial, "[c]ompetent expert testimony . . . established both that Buckley suffered a substantial impact from asbestos that . . . significantly increased his risk of contracting an asbestos-related disease and that Buckley should receive medical monitoring in order to ensure early detection and cure of any asbestos-related disease he develops." 79 F. 3d, at 1347. Thus, Metro-North, "through [its] negligence, caused the plaintiff, in the opinion of medical experts, to need specific medical services—a cost that is neither inconsequential nor of a kind the community generally accepts as part of the wear and tear of daily life. Under [the] principles of tort law, the [tortfeasor] should pay." *Friends for All Children*, 746 F. 2d, at 825.

## B

The Court, as I read its opinion, leaves open the question whether Buckley may state a claim for relief under the FELA. The Court does not question the medical need for monitoring. It recognizes that cancer, one of the diseases Buckley faces an increased risk of suffering, is "unusually threatening and unusually frightening," *ante*, at 435, and that detection of disease in early stages "can help to mitigate potentially serious future health effects," *ante*, at 443. On the other hand, the Court notes there may be "uncertainty among medical professionals about just which tests are most usefully administered and when." *Ante*, at 441.

It is not uncommon, of course, that doctors will agree that medical attention is needed, yet disagree on what monitoring or treatment course is best. But uncertainty as to which tests are best or when they should be administered is not cause to deny a claim for relief. Fact triers in tort cases routinely face questions lacking indubitably clear answers: Did defendant's product cause plaintiff's disease? What will plaintiff's future disability and medical costs be? It bears repetition, moreover, that recovery on a FELA medical mon-

itoring claim would be limited to the incremental cost of tests a reasonable physician would recommend as a result of the plaintiff's exposure. See 79 F. 3d, at 1347.

Occupational Safety and Health Administration (OSHA) regulations governing permissible levels of asbestos exposure in the workplace make it plain that medical monitoring is no "trivial" matter, see *ante*, at 444; the regulations are instructive on appropriate standards for necessary monitoring, see 29 CFR § 1910.1001 (1996); see also 29 U. S. C. § 655(b)(7) (authorizing Secretary of Labor to require employers to provide medical monitoring to employees exposed to hazardous substances). OSHA's regulations direct employers to provide medical monitoring for employees exposed to certain levels of asbestos, and they describe in detail the monitoring employers must make available. See 29 CFR § 1910.1001(*l*), App. D, App. E (1996). These regulations apply to all industries covered by the Occupational Safety and Health Act of 1970 (Act). Although the Act does not apply to state public employers such as Metro-North, see 29 U. S. C. § 652(5), New York State has adopted OSHA standards for its public employers, see N. Y. Lab. Law §§ 27–a(3)(c), (4)(a) (McKinney 1986 and Supp. 1997). Had Metro-North assiduously attended to those standards, Buckley might have been spared the costs he now seeks to recover.[3]

Finally, the Court's anticipation of a "'flood' of less important cases" and "'unlimited and unpredictable liability'" is overblown. See *ante*, at 442. The employee's "injury" in the claim at stake is the economic burden additional medical

---

[3] Buckley's counsel stated at oral argument that the railroad failed to conduct the required monitoring of airborne asbestos in the steam tunnels, and for that reason only, Metro-North escaped compliance with the requirement that employers provide ongoing medical monitoring of employees. Tr. of Oral Arg. 52. The record supports Buckley's assertion that Metro-North did not properly monitor the level of asbestos to which its workers were exposed. See App. 606–607 (noting that in 1986 the New York Department of Labor cited Metro-North for asbestos-related violations, including failure to monitor accurately the airborne concentrations of asbestos).

surveillance entails, see *supra*, at 450–451; if an employer provides all that a reasonable physician would recommend for the exposed employee, the employee would incur no costs and hence have no claim for compensation. Nor does the FELA claim Buckley states pave the way for "tens of millions of individuals" with similar claims. See *ante*, at 442. It is doubtful that many legions in the universe of individuals ever exposed to toxic material could demonstrate that their employers negligently exposed them to a known hazardous substance, and thereby substantially increased the risk that they would suffer debilitating or deadly disease.[4] Withholding relief, moreover, is dangerous, for lives will be lost when grave disease is diagnosed too late.

## C

The Court emphasizes most heavily that several courts, while authorizing recovery for medical monitoring, have imposed or suggested special limitations on the tort remedy. See *ante*, at 440–441. In lieu of lump-sum damages, the Court indicates, a court-supervised fund might be the better remedy. See *ante*, at 441; see also *Potter*, 6 Cal. 4th, at 1006–1010, and n. 28, 863 P. 2d, at 821–825, and n. 28 (recognizing claim and affirming award for medical monitoring; suggesting in footnote creation of court-supervised fund); *Hansen*, 858 P. 2d, at 979–982 (reversing grant of summary judgment and recognizing claim for medical monitoring; suggesting creation of court-supervised fund); *Ayers*, 106 N. J., at 607–611, 525 A. 2d, at 313–315 (affirming damages award for medical monitoring; suggesting creation of court-supervised fund in future cases); *Burns*, 156 Ariz., at 380–381, 752 P. 2d, at 33–34 (recognizing claim for medical monitoring; holding plaintiffs entitled to award from court-supervised fund).

It is scarcely surprising that the Second Circuit did not consider relief through a court-supervised fund. So far as the record before us shows, no party argued in the District

---

[4] If liability under the common law is to extend further, see *ante*, at 442, that is a matter for the States to decide.

Court, the Second Circuit, or even this Court, that medical monitoring expenses may be recoverable, but not through a lump sum, only through a court fund. The question aired below was the prime one the Court obscures: Does Buckley's medical monitoring claim warrant any relief?

Buckley sought "an 'amount of money' sufficient to 'compensate' him for 'future medical monitoring expenses.'" See *ante*, at 439. He was not more precise about the form relief should take. The Court infers from Buckley's proposed charges to the jury, however, that he wanted what "tort law ordinarily permits"—damages in a lump sum. See *ibid.* I believe his claim qualifies for that relief. If the Court deems what "tort law ordinarily permits" inappropriate, however, the Court should at least say, for the guidance of lower courts, "Yes, Buckley has *a* claim for relief." Federal Rule of Civil Procedure 54(c) directs a court to grant the relief to which a prevailing party is entitled, even if the party did not demand such relief in its pleadings. Rule 54(c) thus instructs district courts to "compensate the parties or remedy the situation without regard to the constraints of the antiquated and rigid forms of action." 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2662, pp. 133–134 (2d ed. 1983). Under the Federal Rules, "a party should experience little difficulty in securing a remedy other than that demanded in his pleadings when he shows he is entitled to it." *Id.*, at 135; see also *id.*, § 2664, at 163 (Rule 54(c) "has been utilized when the court awards a different type of relief from that demanded in the complaint"); cf. *Holt Civic Club* v. *Tuscaloosa*, 439 U. S. 60, 65–66 (1978) ("a federal court should not dismiss a meritorious constitutional claim because the complaint seeks one remedy rather than another plainly appropriate one") (citing Rule 54(c)).

\*    \*    \*

The Court today reverses the Second Circuit's determination that Buckley has stated a claim for relief, but remands the case for further proceedings. If I comprehend the Court's enigmatic decision correctly, Buckley may replead a

claim for relief and recover for medical monitoring, but he must receive that relief in a form other than a lump sum. Unaccountably, the Court resists the straightforward statement that would enlighten courts in this and similar cases: A claim for medical monitoring is cognizable under the FELA; it is a claim entirely in step with "'evolving common law.'" See *ante,* at 440 (citing *Gottshall,* 512 U. S., at 558 (SOUTER, J., concurring)). I therefore dissent from the Court's judgment to the extent it relates to medical monitoring.