CAVANAGH, J.
(dissenting). The proper issue in this case is whether defendant must pay for plaintiffs’ medical monitoring costs. However, rather than simply address this basic issue, the majority chooses to use this case as a vehicle to raise fears about the economy and hypothesize that providing medical monitoring to these plaintiffs would result in our state’s economic disaster. *105 The majority erroneously presents this case as one in which it must choose between an equitable remedy for plaintiffs and the economic viability of defendant and of our state. Because the dichotomy the majority has constructed is a false one, I must dissent.
At its core, this case is about rights and responsibilities. Defendant is undeniably responsible for years of actively contaminating the air, water, and soil that surrounds plaintiffs’ homes. Defendant is undeniably responsible for the suffering that plaintiffs must endure as they face years of wondering if the contamination that they and their children have been exposed to will result in devastating illnesses and their untimely deaths. Thus, the issue is who should pay for plaintiffs’ medical monitoring costs under the unique circumstances of this case when it is clear that defendant is responsible for the wrong that prompted the need for plaintiffs to be medically monitored. Stated differently, where defendant has contaminated the environment, should plaintiffs, defendant, or the taxpayers of the state of Michigan pay plaintiffs’ medical , monitoring costs? Whatever the majority’s intent, the result of disregarding the only question properly posed in this case is that plaintiffs’ physical health is inexcusably deemed secondary to defendant’s economic health.
I. PLAINTIFFS PRESENT A REASONABLE CLAIM FOR MEDICAL MONITORING COSTS
Plaintiffs are owners and residents of property located within the one-hundred-year flood plain of the Tittabawassee River in Saginaw County. The Michigan Department of Environmental Quality (MDEQ) found as much as 7,300 parts per trillion (ppt) of dioxin in the flood plain, which substantially exceeds Michigan’s cleanup standard of ninety ppt for direct residential *106 contact.[1] After the MDEQ conducted testing, it determined that defendant was the source of the pollution. Because of the health risks that plaintiffs may face, plaintiffs seek a court-supervised medical monitoring program that is administered by qualified health professionals.
“Dioxin” is the term used to identify a number of similar toxic chemicals. Dioxin is a known human carcinogen and, as the majority notes, “ ‘a potent carcinogen.’ ” Ante at 67 n 1 (citation omitted). Exposure to dioxin can cause cancer, liver disease, birth defects, miscarriages, and reproductive damage, as well as other illnesses. Children are more significantly affected by dioxin than adults. Dioxins do not break down easily. Once dioxin is released into the environment, it stays in the environment for an extremely long time.[2] When dioxin gets into a person’s body, it stays indefinitely in a person’s blood and body fat. Because dioxin stays in the body for a long time, the adverse effects of dioxin exposure may not be immediate.
Plaintiffs’ counsel stated at oral argument that a pilot study of the community conducted by the Michi *107 gan Department of Community Health found that fifty to eighty percent of the people tested have dioxin levels that put them in the 75th to the 95th percentile compared to the national average for their age and gender.
II. PLAINTIFFS’ CLAIM FOR MEDICAL MONITORING WARRANTS EQUITABLE RELIEF
Plaintiffs’ request for a court-supervised medical monitoring program that is administered by qualified health professionals is undoubtedly reasonable. Plaintiffs merely request that defendant pay the cost of medical monitoring to ensure that dioxin-related illnesses are caught at their earliest. Plaintiffs simply seek to minimize the devastating effects of illnesses caused by defendant’s acts.
The majority, ante at 72, notes that “any first-year law student” knows the principle for negligence — duty, breach, causation, and damages — and argues that plaintiffs’ rights have not been actually violated and they have suffered no injuries and, therefore, no damages. With this, I vehemently disagree. Plaintiffs have suffered actual harm and damages — the heightened exposure to dioxin that they received because of defendant’s acts is akin to an injury. Plaintiffs were exposed to dioxin at over eighty times the level deemed safe for direct residential contact. Plaintiffs were advised that routine activities, such as flower gardening and lawn work, could further increase their risk of dioxin exposure. Tittabawassee/Saginaw River Flood Plain, Environmental Assessment Initiative, June 2003. Plaintiffs were further advised that they should avoid allowing their children to play in the soil to avoid further contamination. If it were not for defendant’s acts, plaintiffs would not be obliged to incur the expenses *108 involved in additional testing for early detection of any illnesses caused by the increased dioxin exposure. In this case, the exposure itself and the need for medical monitoring constitute the injury. See, e.g., Petito v AH Robins Co, Inc, 750 So 2d 103, 105 (Fla App, 1999) (“One can hardly dispute that an individual has just as great an interest in avoiding expensive diagnostic examinations as in avoiding physical injury.”).
Plaintiffs can also offer facts sufficient to establish causation, contrary to the majority’s assertion. As noted by the majority, defendant’s Midland plant was identified as the “ ‘principal source of dioxin contamination in the Tittabawassee River sediments and the Tittabawassee River flood plain soils.’ ” Ante at 70 (citation omitted). Given the facts, it is entirely reasonable for plaintiffs to argue that they would not have to undergo medical monitoring tests for dioxin poisoning but for the actions of defendant. To argue that there are insufficient facts to support plaintiffs’ argument is a willful avoidance of the record.
Notably, my belief that these plaintiffs should be allowed to seek equitable relief does not mean that I advocate that any exposure allows a person to bring a claim for medical monitoring costs. That position would indeed be imprudent. However, in this case, a candid review of the facts indicates that plaintiffs’ heightened exposure has caused them harm and plaintiffs have no adequate legal remedy. While plaintiffs may not have yet developed dioxin-related illnesses, the fact remains that they are at a much greater risk because of defendant’s acts. As such, their long-term exposure to dioxin has caused a change in the medical monitoring that plaintiffs would otherwise be prescribed. For example, according to reasonably accepted medical practice, doctors do not generally prescribe testing to determine a *109 patient’s dioxin level. Hdwever, in this case, because ef the prelonged exposure to high levels of dioxin, a doctor may, according to accepted scientific principles, find that such tests are reasonably necessary to best monitor and treat a patient. When these tests are ordered, defendant should he responsible for paying the costs of the tests because defendant is responsible for the need for the tests.
Plaintiffs do not, as the majority asserts, advocate for “a cause of action that departs drastically from our traditional notions of a valid negligence claim” and seek a “radical change” in negligence law. Ante at 83, 89.[3] Medical monitoring is recognized in a number of jurisdictions. See, e.g., In re Paoli R Yard PCB Litigation, 916 F2d 829, 852 (CA 3, 1990); Stead v F E Myers Co, 785 F Supp 56, 57 (D Vt, 1990); Merry v Westinghouse Electric Corp, 684 F Supp 847, 849 (MD Pa, 1988); Bower v Westinghouse Electric Corp, 206 W Va 133, 135; 522 SE2d 424 (1999); Redland Soccer Club, Inc v Dep’t of the Army, 548 Pa 178, 194; 696 A2d 137 (1997); Potter v Firestone Tire & Rubber Co, 6 Cal 4th 965, 974; 863 P2d 795; 25 Cal Rptr 2d 550 (1993); In re Fernald, 1989 US Dist LEXIS 17762 (SD Ohio, 1989) (appointing *110 trustees and special masters to administer a medical monitoring program as part of a $78 million settlement). Moreover, because of the latent nature of most illnesses resulting from exposure to dioxin, plaintiffs may not be able to establish an immediate physical injury of the type contemplated by a traditional tort action. See, e.g., Paoli, supra at 852 (“Medical monitoring claims acknowledge that, in a toxic age, significant harm can be done to an individual by a tortfeasor, notwithstanding latent manifestation of that harm.”); Cook v Rockwell Int’l Corp (Cook I), 755 F Supp 1468, 1476 (D Colo, 1991) (“injuries resulting from exposure to toxic substances are often latent”). But merely because an illness is latent does not mean that plaintiffs have not been injured and suffered damages.[4]
A plaintiff who is involved in an automobile accident and suffers no observable physical injury but nevertheless undergoes medically necessary diagnostic tests to determine whether internal injuries exist is no doubt entitled to recover the costs of the examination. If accepted medical practice also deemed it necessary to perform such tests in the future, in order to detect the onset of any subsequently developing injury caused by the accident, the costs of the continued tests would be recoverable .... The outcome should be the same when the operative incident is toxic exposure rather than collision and the potential future harm is disease rather than physical impairment. [Miranda v Shell Oil Co, 17 Cal App 4th 1651, 1657; 26 Cal Rptr 2d 655 (1993).]
See also Friends for All Children, Inc v Lockheed Aircraft Corp, 241 US App DC 83, 92; 746 F2d 816 (1984).
*111 Because of the established facts in this case, a court-supervised medical monitoring program that is administered by qualified health professionals is a viable and equitable remedy for plaintiffs to seek that is nonpreclusive of any future damages claim. See, e.g., Day v NLO, Inc, 811 F Supp 1271, 1275 (SD Ohio, 1992) (“Because of ongoing court supervision, any medical monitoring awarded by this Court would constitute equitable relief.”). An equitable remedy is necessary because there is no adequate legal remedy for plaintiffs. See Multiplex Concrete Machinery Co v Saxer, 310 Mich 243, 259-260; 17 NW2d 169 (1945); Powers v Fisher, 279 Mich 442, 447; 272 NW 737 (1937). “The absence of precedents, or novelty in incident, presents no obstacle to the exercise of the jurisdiction of a court of equity, and to the award of relief in a proper case.” 30A CJS, Equity, Effect of Absence of Precedents, § 10, pp 171-172; see also 27A Am Jur 2d, Equity, § 100, p 587 (“The appropriateness of the equitable remedy is determined by current rather than past conditions.”). “The essence of a court’s equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action.” Freeman v Pitts, 503 US 467, 487; 112 S Ct 1430; 118 L Ed 2d 108 (1992).
It is within the sound discretion of the courts whether to offer equitable relief. Youngs v West, 317 Mich 538, 545; 27 NW2d 88 (1947). Regardless of how plaintiffs may have characterized their pleadings, “[t]he court has equitable jurisdiction to provide a remedy where none exists at law, even if the parties have not specifically requested an equitable remedy, whenever the pleadings sufficiently give notice of a party’s right to relief and demand for judgment.” 30A CJS, Equity, Lack of Remedy at Law as Ground and Limit of Jurisdiction, § 18, p 180; see also 27A Am Jur 2d, Equity, *112 § 216, p 699 (“Equity jurisdiction nevertheless may arise even though the claimant has pleaded no equitable claims and has not pleaded inadequacy of the remedy at law.”); Parkwood Ltd Dividend Housing Ass’n v State Housing Dev Auth, 468 Mich 763, 774 n 8; 664 NW2d 185 (2003). However, contrary to the majority’s assertion, plaintiffs indeed ask for equitable relief as it relates to medical monitoring. Plaintiffs’ complaint states that they have no adequate remedy at law and they seek “equitable/injunctive relief in the form of a medical monitoring program . . . .”
While the majority argues that the separation of powers precludes it from allowing plaintiffs to proceed, I strongly disagree. The majority’s framing of the issue and its subsequent argument allow it to claim that “[w]e take no position on whether defendant should or should not pay for the costs of monitoring for dioxin-related disease.” Ante at 98. The majority’s argument is essentially that its hands are tied because the Legislature has not acted. But this argument ignores a basic tenet of our system of jurisprudence-courts have the inherent power to provide equitable remedies. “Every equitable right or interest derives not from a declaration of substantive law, but from the broad and flexible jurisdiction of courts of equity to afford remedial relief, where justice and good conscience so dictate.” 30A CJS, Equity, In general, § 93, p 289. The majority’s steadfast insistence that it cannot allow plaintiffs to proceed because the Legislature has not acted allows the majority to sidestep the issue, instead of explicitly stating and supporting its position that these plaintiffs are unworthy of relief.
Because principles of equity are firmly entrenched in our justice system, plaintiffs’ position would not require this Court to depart from longstanding principles fun *113 damental to our justice system. “The purpose of equity is to do complete justice in a case where a court of law is unable, because of the inflexibility of the rules by which it is bound, to adapt its judgment to the special circumstances of the case.” 27A Am Jur 2d, Equity, Nature, Purpose, and Distinguishing Features, § 2, pp 520-521. “[E]quity is the perfection of the law, and is always open to those who have just rights to enforce where the law is inadequate.” Grand Lodge of the Ancient Order of United Workmen of the State of Michigan v Child, 70 Mich 163, 172; 38 NW 1 (1888). Allowing plaintiffs to merely proceed to seek a court-supervised medical monitoring program under equity principles certainly does not stray from the foundations of Anglo-American law.
III. EQUITABLE RELIEF PROPERLY PLACES THE RESPONSIBILITY FOR ANY MEDICAL MONITORING COSTS ON DEFENDANT, THE PARTY RESPONSIBLE FOR IMPOSING THE COSTS ON PLAINTIFFS
Throughout its opinion, the majority invokes the fear of a ruined economy to support its decision. But the majority’s prediction of a ruined economy falters after examining the true nature of the equitable relief that plaintiffs are seeking. Notably, allowing plaintiffs to seek medical monitoring costs would not result in a windfall for plaintiffs. “A medical monitoring claim compensates a plaintiff for diagnostic treatment, a tangible and quantifiable item of damage caused by a defendant’s tortious conduct.” Cook I, supra at 1478; see also Paoli, supra at 850. Notably, these plaintiffs would receive no money whatsoever. Payments for doctor-prescribed testing would be made through a court-supervised fund. This fund would only compensate plaintiffs for medical monitoring costs actually incurred after the monitoring was ordered by a qualified health professional. The only “benefit” that a *114 plaintiff would receive is payment for tests ordered by a doctor that are above and beyond what would generally be ordered for that plaintiff.[5]
Notably, the majority’s concerns about financial impact can actually be alleviated to a great degree by allowing plaintiffs’ practical, proactive approach. A court-supervised medical monitoring program administered by qualified health professionals would provide early detection to plaintiffs and likely lessen the fiscal damages that defendant would be liable for if dioxin-related illnesses are discovered later. The early detection of illnesses may allow treatment to proceed in a more reasonable manner, often with more options for the person affected than if detection had been delayed. See Bower, supra at 140. “It is common knowledge early diagnosis of many serious conditions promotes en *115 hanced cure and survival rates.” Miranda, supra at 1658. “Harm in the form of increased risk of future cancer attributable to delay in diagnosis and treatment has become so widely accepted by the medical community that the existence of such harm could be reasonably inferred from this professional common knowledge.” Evers v Dollinger, 95 NJ 399, 424; 471 A2d 405 (1984). “[E]xperts continuously urge vigilant detection as the most realistic means of improving prognosis....” Id. at 426 n 2, citing Rubin, Clinical Oncology for Medical Students and Physicians (3d ed, 1970-1971), p 33. The intent of medical monitoring is “to facilitate early diagnosis and treatment of disease or illness caused by a plaintiffs exposure to toxic substances as a result of a defendant’s culpable conduct.” Miranda, supra at 1655. Plaintiffs’ counsel clearly articulated just such an example of the benefits of medical monitoring:
Let me give you a very clear example of how medical monitoring would work in an instance like this. Say there’s a woman of child bearing age and her blood is tested for high levels of dioxin and she is found to have high levels of dioxin, 95th percentile or so in her body. Medical doctors who are familiar with dioxin contamination say well one of the possible results of having high levels of dioxin contamination in your blood is that you may have depressed thyroid function. So they do a very simple test, a standard test for thyroid function and find out that there is depression of thyroid function. She is then treated and birth defects that are linked to depressed thyroid function do not happen to her [child]. She does not have a child with a birth defect because that preventative measure prevented that irreparable harm.
The establishment of a court-supervised fund for medical monitoring “encourages plaintiffs to detect and treat their injuries as soon as possible.” Paoli, supra at 852.
*116 Notably, the majority fails to mention that plaintiffs would not be forced to engage in medical monitoring tests if they chose not to. A court-supervised medical monitoring program would allow plaintiffs to make a choice, and those who choose to be monitored and who meet the requirements set forth by qualified health professionals could be monitored.
The majority also notes an argument — not often heard — that monitoring for the early detection of illnesses can actually be bad for plaintiffs because a person with an illness who is erroneously proclaimed healthy may ignore symptoms and, therefore, delay seeking necessary treatment, possibly leading to severe psychological harm. The only logical import from stating these arguments is that because plaintiffs may also be the victims of medical malpractice they should consider not going to a doctor to determine if defendant’s contamination of the environment poisoned them. But a fear of medical malpractice should certainly not result in the position that plaintiffs should forgo necessary medical testing. While the majority states that it does not cite these viewpoints to endorse them, but merely to note their existence, the majority’s citation at the very least indicates that it deems them relevant considerations. I, however, do not believe that the possibility of medical malpractice should be used to support the notion that plaintiffs are not deserving of an equitable remedy.
Also, contrary to the majority, I do not believe that an equitable remedy should be refused merely because administering the remedy may be inconvenient or even difficult. “Rather, the true principle [of equitable relief] seems to be that the hardship of the plaintiff is balanced against the inconveniences and difficulties anticipated by the court, which principle is sometimes called the *117 ‘balance of convenience.’ ” 27A Am Jur 2d, Equity, § 101, p 587. Indeed, the desegregation of our nation’s schools was certainly not an easy task, yet the United States Supreme Court found that overseeing this process was an appropriate equitable remedy for the courts. Brown v Bd of Ed of Topeka, 349 US 294, 300; 75 S Ct 753; 99 L Ed 1083 (1955) (“Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.”). I certainly believe that a court in our state, just as courts have done in other states, can determine a suitable way to administer a medical monitoring program. See, e.g., Cook v Rockwell Int’l Corp, 778 F Supp 512, 515 (D Colo, 1991) (Cook II); Burns v Jaquays Mining Corp, 156 Ariz 375, 380-381; 752 P2d 28 (1987); 27A Am Jur 2d, Equity, § 103, p 588 (“[A] court of equity is clothed with, the authority to designate a commission, master, receiver, or agent of the court to effectuate and supervise compliance with its decrees and orders.”).
Finally, not content to merely present this case as one in which allowing plaintiffs to seek an equitable remedy would devastate the economy of Michigan, the majority also seeks to pit plaintiffs against “those devastated by cancer, birth defects, and other dioxin-related diseases . .. .” Ante at 99. While the majority accuses the dissent of countless transgressions, I can think of no greater misdeed than to actually argue that allowing these plaintiffs to seek the equitable remedy of requiring this defendant to pay for the costs of necessary medical monitoring tests somehow would divert resources from children with birth defects. This is fabrication at its most unforgivable — refusing to acknowledge that providing these plaintiffs with the opportunity to merely seek an equitable remedy is well *118 within the bounds of judicial discretion and will not devastate the economy or cause sick children to die.
IV A FURTHER REVIEW OF THE ECONOMIC CONSIDERATIONS OF PLAINTIFFS’ CLAIM INDICATES THAT EQUITABLE RELIEF IS PROPER
At its core, this is not a complex case. Defendant contaminated the environment with dioxin. Because of defendant’s conduct, plaintiffs require medical monitoring to ensure that the negative effects of defendant’s acts can be best countered. Medical monitoring costs money. Plaintiffs, defendant, or the taxpayers of the state of Michigan must pay the costs. Because plaintiffs only require medical monitoring as a result of defendant’s conduct, it seems clear that it is reasonable that defendant pay the costs.[6] This is not meant to punish defendant; it merely seeks to hold defendant to the reasonable standard that a polluter pays for the costs of polluting. “The mere fact that a wrongdoer may suffer, however, will not deter equity from granting relief to an injured party.” 27A Am Jur 2d, Equity, § 102, p 588.
The majority’s decision that plaintiffs cannot seek equitable relief is indefensible when one realizes that its position leaves plaintiffs who cannot afford to pay for doctor-prescribed medical monitoring with no recourse. “Special tests are available to measure dioxin levels in body fat, blood, and breast milk, but these tests are very expensive and are not routinely available to the public.” Dioxins Fact Sheet, supra. “Indeed, in many cases a *119 person will not be able to afford such tests, and refusing to allow medical monitoring damages would in effect deny him or her access to potentially life-saving treatment.” Hansen v Mountain Fuel Supply Co, 858 P2d 970, 976 (Utah, 1993) (medical monitoring costs maybe awarded even when the plaintiffs have not yet suffered from any asbestos-related illnesses). As plaintiffs’ counsel stated, researchers conducting the pilot studies “have been besieged by people begging to have their blood tested and particularly begging to get their children tested because it’s very difficult to do that by yourself.... it’s really, really hard for individuals to get them done because it’s cost prohibitive and beyond that it’s just not available to them as individuals.”
Whatever its intent, the majority’s result protects a wrong-doing corporation at the expense of the health of the people wronged. But we cannot turn a blind eye to defendant’s repeated contamination of our state’s environment because holding defendant accountable may negatively affect its profits. If defendant cannot produce its product without behaving responsibly, then it has no business operating within our state. The lives of the people in the affected area are worth more than defendant’s financial well-being, even if it were indeed at stake. And contrary to the majority’s position, I am fully aware of the “real-world effects” of today’s decision, as plaintiffs most certainly will be as well. The “real-world effects” are that defendant, the party responsible for plaintiffs’ need for medical monitoring, will not bear any of the costs of its wrongdoing. Rather, the burden now falls on plaintiffs’ shoulders.
The decision to turn our backs on plaintiffs because we have not yet faced a case so egregious violates the trust that the people of the state of Michigan have placed in us. “Our oath is to do justice, not to perpetu *120 ate error.” Montgomery v Stephan, 359 Mich 33, 38; 101 NW2d 227 (1960). “Lack of precedent cannot absolve a common-law court from responsibility for adjudicating each claim that comes before it on its own merits.” Berger v Weber, 411 Mich 1, 12; 303 NW2d 424 (1981). “It is the distinguishing feature of equity jurisdiction that it will apply settled rules to unusual conditions and mold its decrees so as to do equity between the parties.” 30A CJS, Equity, Effect of Absence of Precedents, § 10, p 172. Where a claim is equitable in nature, exercising discretion may be necessary to ensure that an unconscionable decree is not entered. Kratze v Independent Order of Oddfellows, 442 Mich 136, 142; 500 NW2d 115 (1993). And that discretion most certainly should be exercised in this case.
While no one can say with certainty which plaintiffs will contract illnesses, suffer, and die because of their increased exposure to dioxin, this does not mean that plaintiffs cannot seek an equitable remedy. The unfortunate reality is that dioxin causes cancer, birth defects, and other illnesses. The prolonged exposure of plaintiffs to such high levels of dioxin puts them at a vastly increased risk. When a qualified health professional believes that it is in a patient’s best interest to administer medical testing that would not be required if it were not for defendant’s acts, this Court should not deny plaintiffs the ability to seek this modest remedy.
V THE “REMEDY” OFFERED BY THE NATURAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT DOES NOT PRECLUDE PLAINTIFFS’ CAUSE OF ACTION
The majority states that the Legislature has already provided plaintiffs with a remedy because the “Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 et seq., empowers the MDEQ to deal with the environmental and health effects of toxic *121 pollution . .. Ante at 93. While the MDEQ may take responsive action, it is not required to take action. Further, the fact that the MDEQ may choose to take responsive action to minimize injury to the public health does not absolve defendant of its responsibility to plaintiffs. While the majority repeatedly claims to be concerned about the effect on Michigan’s economy if plaintiffs are allowed to bring a claim against defendant, the majority’s approach shifts the costs resulting from defendant’s actions to Michigan taxpayers.[7] The majority distorts the fact that the MDEQ has the ability to take responsive action. Merely because the MDEQ has this ability does not mean that this is plaintiffs’ sole remedy. The NREPA clearly provides “[t]hat there is a need for additional administrative and judicial remedies to supplement existing statutory and common law remedies.” MCL 324.20102(d) (emphasis added). The MDEQ’s ability to act does not eliminate defendant’s responsibility to plaintiffs or eliminate the fact that plaintiffs can seek a court-supervised medical monitoring program funded by defendant.
As a case in point, a small pilot study is being conducted by the state that includes a study of residential soil at approximately twenty-five properties within the Tittabawassee River flood plain and an investigation of dioxin levels in twenty-five adults who are currently living on the flood plain and have lived there for at least five years. This Pilot Exposure Investigation is inadequate to address the concerns of the individual plaintiffs. But plaintiffs do not, as the majority asserts, bring this claim merely because the MDEQ is not *122 conducting the study on the scale that they prefer. Plaintiffs seek a court-supervised medical monitoring program based on tests ordered by qualified health professionals; plaintiffs’ individual preferences have nothing to do with the tests that will be ultimately ordered. Medical monitoring tests would not be done to placate plaintiffs’ fears; they would be done when qualified health professionals using accepted scientific principles order medical testing.
Finally, the concern of the MDEQ is public health, but what the MDEQ may deem appropriate to protect the public as a whole, even assuming sufficient funds were available in the budget, is not necessarily what may be in an individual plaintiffs best medical interest. Further, the MDEQ does not purport that its study can be extrapolated to provide relevant information to other people in the affected areas. The MDEQ even states in its Pilot Investigation Fact Sheet that the results of an exposure investigation (El) are “site-specific and applicable only to the community involved in El; they are not generalizable to other individuals or populations.” The majority’s insistent and inexplicable refusal to hold defendant accountable for its acts allows defendant to escape responsibility for its actions and leaves plaintiffs with no adequate remedy.
VI. CONCLUSION
Today, the majority holds that defendant’s egregious long-term contamination of our environment and the resulting negative health effects to plaintiffs are just another accepted cost of doing business. But as long as defendant is not held responsible for the decisions it makes, it behooves corporations like defendant to continue with business practices that harm our residents because the courts will shield them from liability by *123 claiming that they are powerless to act. And it is the people of our state who will pay the costs — with their money and with their lives — of allowing defendant to contaminate our environment with no repercussions. Sadly, this Court has resorted to a cost-benefit analysis to determine and, consequently, degrade the value of human life, and this is an analysis that I cannot support.
“The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.” Marbury v Madison, 5 US 137, 163; 2 L Ed 60 (1803). Today, our Court has shirked its duty to protect plaintiffs and the people of our state, thereby leaving defendant’s practices and interests unassailed. As such, I must respectfully dissent.
KELLY, J., concurred with CAVANAGH, J.

 The Michigan Department of Community Health, the Michigan Department of Environmental Quality, and the Michigan Department of Agriculture state that “recent studies suggest that dioxins may be far more harmful to human health than was previously believed and these standards [referring to standards for drinking water and eating fish and shellfish] as well as others set for soil, sediment, and food may change in the future.” Dioxins Fact Sheet.

 The majority notes that defendant has entered into a settlement agreement in which “defendant will fund extensive cleanup efforts aimed at minimizing residents’ exposure to dioxin.” Ante at 71 n 3. The specifics of this agreement indicate that defendant is willing to pay for items such as landscaping some homes to cover exposed soil and augmenting some ground cover in public parks; however, defendant remains unwilling to pay for any necessary medical monitoring costs as a result of its dioxin contamination.

 Also, contrary to the majority’s assertion, Larson v Johns-Manville Sales Corp, 427 Mich 301, 304-305; 399 NW2d 1 (1986), does not affect the decision before the Court today. Larson dealt with the statute of limitations for causes of action for asbestosis and cancer related to asbestos exposure. This Court held that a cause of action for asbestosis or cancer related to asbestos exposure accrues when a person learns or should learn that he has developed asbestosis or cancer, not when he was first exposed to asbestos. This was necessary because the underlying claims in Larson were wrongful death actions premised on asbestosis and cancer. A person cannot bring a wrongful death claim for asbestosis until the victim actually has asbestosis. But Larson has no effect on whether plaintiffs can seek an equitable remedy for a court-supervised medical monitoring program that is administered by health professionals.

 “The ‘injury’ that underlies a claim for medical monitoring — just as with any other cause of action sounding in tort — is ‘the invasion of any legally protected interest.’ ” Bower, supra at 139, quoting Restatement Torts, 2d, § 7(1) (1964).

 This is in contrast to the relief sought in Metro-North Commuter R Co v Buckley, 521 US 424, 439-441; 117 S Ct 2113; 138 L Ed 2d 560 (1997). In Metro-North, an employee sought a change in the common law that would permit a lump-sum damages award for medical monitoring costs. The Court stated the following:
[W]e do not find sufficient support in the common law for the unqualified rule of lump-sum damages recovery that is, at least arguably, before us here. And given the mix of competing general policy considerations, plaintiffs policy-based arguments do not convince us that the PELA [Federal Employers’ Liability Act] contains a tort liability rule of that unqualified kind.
This limited conclusion disposes of the matter before us. We need not, and do not, express any view here about the extent to which the FELA might, or might not, accommodate medical cost recovery rules more finely tailored than the rule we have considered. [Id. at 444.]
As Justice Ginsburg, concurring in part and dissenting in part, in Metro-North, supra at 455-456, noted, “If I comprehend the Court’s enigmatic decision correctly, Buckley [the employee] may replead a claim for relief and recover for medical monitoring, but he must receive that relief in a form other than a lump sum.”

 The theory behind a claim for medical monitoring is simple. When a plaintiff is exposed to a hazardous substance, it is often sound medical practice to seek periodic medical monitoring to ascertain whether the plaintiff has contracted a disease. Because this need for medical monitoring was caused by a defendant’s tortious acts or omissions, a defendant may be required to pay the cost of monitoring. [Cook I, supra at 1477.]

 A shift in financial responsibility conflicts with the NREPA. MCL 324.20102(f) specifically provides, “That liability for response activities to address environmental contamination should be imposed upon those persons who are responsible for the environmental contamination.” See also MCL 324.20102(e).