# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRIAN STACY,

*Plaintiff-Appellant,*

v.

REDERIET OTTO DANIELSEN, A.S.;
K.S. ARIES SHIPPING,

*Defendants-Appellees.*

No. 09-15579

D.C. Nos.
4:07-cv-05487-CW
08-cv-03586-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Submitted March 10, 2010[1]
San Francisco, California

Filed June 29, 2010

Before: Cynthia Holcomb Hall, John T. Noonan and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Noonan;
Dissent by Judge Hall

---

[1]The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

## COUNSEL

John J. Hughes, Law Offices of John J. Hughes, San Francisco, California, for the plaintiff-appellant.

James J. Tamulski, Emard Danoff Port Tamulski & Paetzold LLP, San Francisco, California, for the defendants-appellees.

---

## OPINION

NOONAN, Circuit Judge:

Dense fog off of Point Reyes, California, "the foggiest point on the Pacific coast." K. Goodwin, *Point Reyes Visions* (2008). A covey of fishing vessels trolling for salmon in the fog. Afternoon, July 13, 2007, M/V *Eva Danielsen* departs San Francisco loaded with cargo destined for Portland. The *Eva Danielsen* is 291 feet in length and has a dead weight of 4,286 tons. Among the covey of fishing vessels is the *Marja*, owned and operated by Brian Stacy. At 5 P.M., the radar of the *Marja* picks up the *Eva Danielsen*, one mile away, headed to the *Marja* on a collision course. The *Marja* signals the danger to the freighter. The *Eva Danielsen* avoids hitting the *Marja* but comes close enough for Stacy to hear her engine and machinery and to feel the vessel's wake. She passes at close quarters.

Having passed the *Marja,* the *Eva Danielsen* collides with the F/V *Buona Madre*. The collision destroys the fishing vessel and results in the death of her captain, Paul Alan Wade. This lawsuit followed from these events.

### PROCEEDINGS

Brian Stacy brought this suit against the owners and operators of the *Eva Danielsen* for the negligent infliction of emotional distress. Stacy alleged that the freighter was proceeding at an unsafe speed without a proper lookout, proper radar equipment, or proper signals in violation of the International Navigation Rules Act. Stacy alleged that this action put him in grave and imminent risk of death or great bodily harm,

impacting him emotionally so that he could not work and needed psychiatric help.

On motion of the defendants, the district court dismissed Stacy's first amended complaint for failure to state a cause of action. The court stated:

> The Court concludes that, because very few jurisdictions employ a zone of danger test that lacks a "witnessed harm" requirement, even if a maritime [negligent infliction of emotional distress (NIED)] claim may be brought under a zone of danger theory, the claim must be premised on the plaintiff's having experienced a "psychic injury" by "witnessing another being seriously injured or killed," *Chan* [*v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1408 (9th cir. 1994)] (emphasis omitted), while simultaneously being threatened with physical injury to him or herself. The Court will thus evaluate Plaintiff's allegation of NIED under *Chan*'s formulation of the zone of danger test.

Stacy appeals.

## ANALYSIS

Jurisdiction is based on federal maritime jurisdiction of torts committed on the high seas. 28 U.S.C. § 1333(1). We disregard as erroneous and irrelevant Stacy's alternative jurisdictional theory of diversity of citizenship.

We review de novo the dismissal. *Barker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009). We accept as true facts alleged and draw inferences from them in the light most favorable to the plaintiff. *Id.* The sufficiency of the complaint is governed by the general maritime law of the United States. *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1409 (9th Cir. 1994). The federal standard for the

negligent infliction of emotional distress is provided by *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 547-48 (1994).

**[1]** Under this test, applicable in the maritime jurisdiction of the United States, a tort is committed by a defendant subjecting a plaintiff to emotional harm within "the zone of danger" created by the conduct of the defendant. *Id*. In *Gottshall*, the Supreme Court held that "the zone of danger" test allowed recovery for "those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." *Id*. The Supreme Court went on to quote a law review article's exposition: "That is, 'those within the zone of danger of physical impact can recover for fright, and those outside of it cannot.' " *Id*. at 548 (quoting Richard N. Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm*, 34 U. Fla. L. Rev. 447, 489 (1982)).

**[2]** Stacy alleged that he was within the zone of danger and that he suffered emotional distress from the fright caused by the negligent action of the defendants. Nothing more was required to assert a cause of action cognizable under maritime law.[2]

(Text continued on page 9412)

---

[2]The dissent is based on the proposition that the zone of danger test requires a plaintiff to witness harm to another person, rejecting the mine-run cases where the plaintiff is the direct victim of negligent conduct. The zone of danger test, however, only came to accommodate bystanders after many years of doctrinal development. *See, e.g.*, *Jarrett v. Jones*, 258 S.W.3d 442, 445 (Mo. 2008). The dissent relies on our decision in *Chan* as though it adopted the witness test as exclusive. Judge Goodwin wrote for the panel in *Chan*: "at issue here is the *psychic injury* that comes from *witnessing* another being seriously injured or killed." 39 F.3d at 1408. The panel did not address the case where a plaintiff suffers psychic damage from a direct encounter.

Failure to distinguish between direct and derivative emotional harm undermines the dissent. The dissent relies on a passage from *Gottshall* rejecting the Third Circuit's "foreseeability" test. Nothing in this passage

imposes a "witnessed harm" requirement for claims of direct emotional harm.

The dissent also relies on two annotations. The first bears the title, *Recovery Under State Law for Negligent Infliction of Emotional Distress Due to Witnessing Injury to Another Where Bystander Plaintiff Must Suffer Physical Impact or Be in Zone of Danger*, 89 A.L.R. 5th 255 (2010) (underline added). Given the title of this annotation, it is unsurprising that the cases therein only involve "witnessed harms." A book titled *New York Skyscrapers* will likely not discuss the Sears Tower or Taipei 101. We would err, of course, to conclude that these structures do not exist. The second annotation simply does not support the dissent's position; it contains ample authorities applying the zone of danger test to direct victims, not only bystanders. *See Recovery for Negligent or Intentional Infliction of Emotional Distress Under Jones Act (46 U.S.C.A. Appx. § 688) or Under Federal Employers' Liability Act (45 U.S.C.A. §§ 51 et seq.)*, 123 A.L.R. Fed. 583 § II.A.3 (2010) (citing, *inter alia*, *Hall v. Norfolk S. Ry. Co.*, 829 F. Supp. 1571, 1576 (N.D. Ga. 1993) ("A majority of jurisdictions now use the 'zone of danger' rule, which permits recovery for emotional injuries resulting from witnessing physical harm to another *or* from fearing physical harm to oneself.")).

The dissent repeats its fallacy by relying on two cases that purportedly "formulate the 'zone of danger test' as including a 'witnessed harm' requirement." Dis. Op. 9424. By their own terms, those cases addressed "negligent infliction of emotional distress *upon injury to a third person*." *Asaro v. Cardinal Glennon Mem'l Hosp.*, 799 S.W.2d 595, 600 (Mo. 1990) (emphasis added); *see Rickey v. Chicago Transit Auth.*, 457 N.E.2d 1, 5 (Ill. 1983) (applying the zone of danger test to "a *bystander* who is in the zone of physical danger" (emphasis added)).

The dissent's "not-so hypothetical" scenario is vivid and thought-provoking. It underscores the dissent's faulty rationale. The dissent envisions a speeding motorist who nearly collides with "dozens, perhaps hundreds of other vehicles" over a two-hundred mile stretch of highway. Dis. Op. 9428. At the end of this distance, the motorist dramatically collides with a big rig. *Id.* at 9427-28. The "dozens, perhaps hundreds of other vehicles" could potentially prevail against the speeding motorist under a zone of danger theory, assuming they each suffered emotional distress from their own near-collisions. *See, e.g.*, *Wooden v. Raveling*, 71 Cal. Rptr. 2d 891 (Ct. App. 1998); *see also Camper v. Minor*, 915 S.W.2d 437, 442 (Tenn. 1996) (noting that the zone of danger test "arose primarily from 'near-miss' automobile accident cases"). The vehicles sufficiently

**[3]** The Supreme Court has not abandoned its statement of the tort inflicted by creating a zone of danger. *Metro-N. Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 430 (1997) ("immediate risk of physical harm" created by the defendant's conduct); *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 146 (2003) ("those who escaped instant physical harm, but were 'within the zone of danger of physical impact' "). As would be expected, the Ninth Circuit has followed this standard. *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1082 (9th Cir. 2003).

The dissent cites cases in which various state courts defined the zone of danger by reference to the plaintiff being the witness of an accident to someone else. *Gottshall* cited those cases. It did not endorse them. *Gottshall* explicitly stated that the zone included a plaintiff "placed in immediate risk of physical harm."

*Chan* tells us how we have maritime jurisdiction of a claim for the tortious infliction of emotional injury. It is otherwise not instructive here. Judge Goodwin, writing for the panel in *Chan*, stated: "at issue here is the psychic injury that comes from witnessing another being seriously injured or killed." 39 F.3d at 1408 (emphasis omitted). After setting out its understanding of the various tests for the tort at issue, the court declared: "it is clear that we need not decide which test to adopt today to decide this appeal. None of these theories allows recovery for emotional distress when the plaintiff was not present at the accident scene." *Id.* at 1409.

---

near the final collision with the big rig may possibly recover as bystanders. *Cf., e.g.*, *Zea v. Kolb*, 613 N.Y.S.2d 88, 88 (App. Div. 1994); *Stadler v. Cross*, 295 N.W.2d 552, 554 (Minn. 1980). Yet under the dissent's approach, the most obvious candidate for recovery—the driver of the big rig—would have no claim against the speeding motorist. After all, the driver of the big rig did not witness any collision between the speeding motorist and a third party; the driver of the big rig was the direct victim of negligent conduct, and under the dissent's view, his claim is foreclosed by *Chan.*

**[4]** Nothing in *Chan* addresses a claim of emotional damages by a person directly endangered by a vessel. Nothing in *Chan* purports to refine or reject the teaching of the Supreme Court in *Gottshall*. Nothing in *Chan* is relevant to the adequacy of Stacy's complaint.

For these reasons, the judgment of the district court is REVERSED and the case is REMANDED for further proceedings.

___

HALL, Circuit Judge, dissenting:

The majority's dramatic rendering of the events that led to the tragic death of plaintiff Brian Stacy's fellow fisherman, Paul Wade, omits certain important facts. The majority also refuses to follow binding circuit precedent, *Chan v. Society Expeditions, Inc.,* 39 F.3d 1398 (9th Cir. 1994), in which a three-judge panel of this court defined the contours of the "zone of danger" test for claims of negligent infliction of emotional distress ("NIED") under general maritime law, and announced a formulation of that test which is well grounded in state common law, appropriate to the maritime context, and consistent with Supreme Court precedent regarding claims of NIED under federal common law. *Id.* at 1408-09.

Under the *Chan* formulation of the "zone of danger" test—which is the only one of the three major common law tests defining the class of plaintiffs who can recover damages for NIED that even arguably applies in this case—recovery of damages for NIED is allowed without proof of any physical impact or injury to the plaintiff, so long as he or she: (1) witnessed peril or harm to another, and (2) was also threatened with physical harm as a consequence of the defendant's negligence. *Id.* at 1409. I believe we are bound by *Chan*, and that Stacy has not stated and cannot state a claim for NIED under

the *Chan* "zone of danger" test. Therefore, I respectfully dissent.

## I.

First the material facts of this case, as alleged in Stacy's first amended complaint: On the afternoon of July 13, 2007, Stacy was alone on his 32-foot commercial fishing vessel, the *Marja*, fishing for salmon in the waters off Point Reyes National Seashore just outside of the San Francisco Bay. Stacy had his trolling gear deployed, which restricted maneuverability, and was underway at a speed of approximately 3 knots. Other vessels, including Wade's *Buona Madre*, were fishing nearby. Dense fog restricted visibility in the area to "near zero."

At about the same time, a 291-foot commercial freighter named *Eva Danielsen*—which was owned and operated by appellees—left San Francisco, bound for Portland, Oregon. At approximately 5:00 p.m., the *Eva Danielsen* entered the fishing grounds, traveling at excessive speed, without appropriate lookouts, without sounding proper signals, without keeping proper radar watch, and otherwise proceeding in violation of International Navigation Rules that govern vessel traffic in the area.

Using radar, Stacy observed that the *Eva Danielsen* was within one mile of his vessel and appeared to be on a collision course. He established radio contact with the *Eva Danielsen*, which subsequently altered its course to avoid Stacy's vessel. Again using radar, Stacy watched as the *Eva Danielsen* passed by his vessel and continued on into the rest of the fishing fleet. The fog was too dense for him to actually see the ship, but Stacy felt the *Eva Danielsen*'s wake and heard its engine as it passed "at close quarters."

Although the *Eva Danielsen* avoided Stacy's vessel, it collided with the *Buona Madre*. Stacy alleges that the *Buona*

*Madre* was "near" the *Marja* at the time of the collision, but he does not alleged that he saw, heard, felt, or otherwise perceived the collision contemporaneously with its occurrence.

The *Eva Danielsen* reported a collision to the Coast Guard by radio, and conducted a brief search. Following this report, Stacy proceeded north of his position to assist in the search for persons in the water. During this period, Stacy heard radio traffic expressing a belief that it was his vessel, the *Marja*, that was run down by the *Eva Danielsen.* Stacy advised all concerned that he was safe, and that the *Marja* had not been struck by the freighter. Following this report, the search was suspended and Stacy resumed fishing.

It was not until four days later, on or about July 17, 2007, that Stacy learned from other fishermen that the *Buona Madre* had been run down by the *Eva Danielsen*, and that its captain, Wade, had died after the collision. Stacy also learned that Wade had been alive after the collision, floating in the water near where Stacy had been fishing. There is no indication that Stacy knew Wade. Nor is there any allegation that Stacy knew the *Buona Madre* was among the vessels in the fishing grounds on the fateful day as the *Eva Danielsen* passed through.

Stacy filed his complaint against the owners and operators of the *Eva Danielsen* in federal court, alleging a single claim for NIED under general maritime law. Stacy alleged that, as a result of the events described in his complaint, he "was placed in grave and imminent risk of death or great bodily harm, and as a result suffered and continues to suffer great physical, mental, and nervous pain and suffering, stress and anxiety." He further alleges that he "was required to and did employ physicians and surgeons to examine, treat and care for him," and that he was also "prevented from attending to his usual occupation and thereby has lost earnings and benefits."

Relying on *Chan*, 39 F.3d 1398, the district court acknowledged that a claim for NIED is cognizable under maritime

law, but it nevertheless granted the appellees' motion to dismiss Stacy's complaint for failure to state a claim upon which relief could be granted. After finding both the so-called "physical impact" test and the "relative bystander rule" inapplicable in the context of this case, the district court carefully considered whether Stacy might be able to state a claim under the "zone of danger" theory as articulated in *Chan.* Faithfully applying the limiting test announced by this court in *Chan,* the district court concluded that he could not. Citing *Chan,* 39 F.3d at 1408, the district court explained:

> [B]ecause very few jurisdictions employ a zone of danger test that lacks a "witnessed harm" requirement, even if a maritime [NIED] claim may be brought under a zone of danger theory, the claim must be premised on the plaintiff's having experienced a "psychic injury" by "witnessing another being seriously injured or killed," while simultaneously being threatened with physical injury to him or herself.

The district court granted Stacy leave to amend his complaint, but Stacy declined. Accordingly, the district court dismissed his complaint with prejudice.

## II.

In *Chan,* a three-judge panel of this court was called upon to decide whether a claim for damages for NIED is cognizable under general maritime law, and, if so, to determine the "threshold standard" for such claims under federal common law. 39 F.3d at 1408-09. A brief synopsis of the facts and holding of *Chan* is called for here, as the majority suggests the "zone of danger" test adopted by the panel in that case was mere dictum, or is somehow inapposite in the factual circumstances of this case.

**A.**

In *Chan*, two members of the Chan family, father Benny and daughter Samantha, were injured during a cruise on a ship chartered by the father's employer, Society Expeditions. 39 F.3d at 1401-02. On the second day of the cruise, Benny and Samantha were among a group of passengers being ferried from the ship by an inflatable raft to a coral atoll when the raft turned broadside to a wave and capsized. *Id.* at 1402. Benny and Samantha were thrown into the surf, and the pilot of the raft and another passenger died in the capsizing. *Id.* Benny sustained severe brain and head injuries, as well as other physical injuries, and Samantha sustained both physical and emotional injuries. *Id.*

The Chans filed a complaint against the owners of the ship and Society Expeditions, including claims seeking damages for emotional distress under general maritime law on behalf of Samantha, her two siblings who were not with the family on the cruise, and her mother, Victoria. Citing *Sea-Land Service v. Gaudet*, 414 U.S. 573, 585 n. 17 (1974) and *Cook v. Ross Island Sand & Gravel Co.*, 626 F.2d 746, 752 (9th Cir.1980), the district court in *Chan* dismissed all of the emotional distress claims, concluding that the mental pain and anguish of an injured party's family is not compensable in an action under general maritime law. 39 F.3d at 1408.

**B.**

While the *Chan* case was pending on appeal, the Supreme Court decided *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532 (1994), and for the first time recognized a federal common law claim for NIED—in that case for a railroad worker subject to the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 ("FELA"). *Gottshall,* 512 U.S. at 549-50. However, because it was concerned that recognition of such claims poses "the very real possibility of nearly infinite and unpredictable liability for defendants," the Supreme Court evalu-

ated the three major theories that *limit* the class of plaintiffs who can recover damages for NIED under state common law —i.e., the "physical impact" test, the "zone of danger" test, and the "relative bystander" test. *Id*. at 546-49. After a lengthy discussion of the evolution of the NIED tort and the policy underpinnings of the three common law tests, the Supreme Court adopted the "zone of danger" test for NIED claims brought pursuant to FELA. *Id*. at 547-548.

As articulated by the Supreme Court in *Gottshall*, recovery of damages for NIED is available under the "zone of danger" test to "those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." The Court explained that is was adopting that test because it is the one that "best harmonizes" the statute's "central focus on physical perils," its intent to "encourage employers to improve safety measures in order to avoid [such] claims" and to "provide compensation for injuries and death caused by the physical dangers of railroad work," and its "broad remedial goals," with the countervailing policy concerns about "the potential for a flood of trivial suits, the possibility of fraudulent claims that are difficult for judges and juries to detect, and the specter of unlimited and unpredictable liability." *Id.* at 555-56.

## C.

Following the lead of *Gottshall,* the *Chan* panel held that a claim for NIED is cognizable under general maritime law. 39 F.3d at 1408-09. But, contrary to the majority's assertion, that is not all the *Chan* panel decided. Declaring that "[w]e next must decide the threshold standard that must be met by plaintiffs bringing claims for [NIED]" under general maritime law, the *Chan* panel looked to state common law, as instructed by the Supreme Court in *Gottshall*, and proceeded to discuss the same three theories limiting recovery for NIED

identified by the Supreme Court in *Gottshall*. 39 F.3d at 1409-10.

In describing the most restrictive theory, the "physical injury or impact" test, the *Chan* panel stated that it allows a plaintiff to recover emotional distress damages "only if he or she suffers an accompanying physical injury or contact." *Id.* at 1409 (citing *Plaisance v. Texaco, Inc.*, 937 F.2d 1004, 1009 (5th Cir.1991), *aff'd on other grounds*, 966 F.2d 166 (5th Cir.1992), *cert. denied*, 506 U.S. 1001 (1992)). Turning to the next most restrictive theory, the *Chan* panel articulated the "zone of danger" doctrine as follows:

> Under . . . the "zone of danger" doctrine, plaintiff may recover even though there is no physical contact, so long as the plaintiff (1) witnesses peril or harm to another and (2) is also threatened with physical harm as a consequence of the defendant's negligence.

39 F.3d at 1409 (citing *Plaisance*, 966 F.2d at 168, and *Nelsen v. Research Corp. of Univ. of Haw.*, 805 F.Supp. 837 (D. Hawaii 1992)). Finally, the *Chan* panel described what it called the "bystander proximity" test for NIED as follows:

> The bystander proximity rule permits recovery, even if one is not in the zone of danger, provided the complainant: (1) is physically near the scene of the accident; (2) personally observes the accident; and (3) is closely related to the victim.

39 F.3d at 1410 (citing *Dillon v. Legg*, 68 Cal.2d 728 (1968)).

After outlining the three tests, the *Chan* panel decided that it did not need to select one of the common law limiting tests for NIED to be controlling in all cases arising in the maritime context—as the *Gottshall* Court had done in the FELA context—because none of those theories would allow recov-

ery by the two Chan children who were not physically present on the cruise with their parents and Samantha, and because the facts alleged as to Samantha would allow her to recover under all three of the theories. 39 F.3d at 1410. What the majority overlooks in suggesting that the "zone of danger" theory articulated in *Chan* is mere dictum, however, is that the panel in that case apparently believed it *was* necessary to define the legal contours of a claim of NIED under each of the three theories, to be applied by the district court as to Victoria Chan's NIED claim after affording her a chance to amend her complaint in light of the panel's decision. *Id.* Thus, I believe the "zone of danger" test articulated in *Chan* has binding precedential force in this circuit, provides the rule of decision for this case, and we are not free to ignore it. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).[1]

## III.

The majority implies, however, that the *Chan* panel's formulation of the "zone of danger" test is inconsistent with the test adopted by the Supreme Court in *Gottshall* and subsequently applied by the Court to NIED claims arising in FELA cases, albeit in very different factual contexts. *See Metro-N. Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 430 (1997) (no right to recover damages for "fear of cancer" under "zone of danger" test for NIED based on mere exposure to asbestos without evidence of any "physical impact," i.e., that the plaintiff has developed asbestos-related disease); *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 146 (2003) (recovery allowed under "zone of danger" test for NIED where the plaintiff has

---

[1] I do not believe we must decide whether, in an appropriate case, a claim of NIED satisfying the "bystander proximity" or "relative bystander" test may also be recognized in the maritime context. As the *Chan* case shows, it is not at all "unlikely" that a person involved in a maritime accident—as opposed to a railroad worker covered by FELA—would have occasion to witness the death or serious injury of a close family member, whether or not that person was within the "zone of danger." 39 F.3d at 1401-02; *cf. Gottshall*, 512 U.S. at 548-49, 556.

been diagnosed with asbestosis, and damages for "fear of cancer" are alleged as part of the pain and suffering associated with existing asbestos-related disease). For reasons I will explain, I disagree.

## A.

Ignoring the in-depth reasoning in Justice Thomas's majority opinion in *Gottshall,* the majority here quotes only a preliminary statement of the "zone of danger" test recited by the *Gottshall* Court, as follows:

> Perhaps based on the realization that "a near miss may be as frightening as a direct hit," the zone of danger test limits recovery for emotional injury to those plaintiffs *who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct.* That is, "those within the zone of danger of physical impact can recover for fright, and those outside of it cannot."

512 U.S. at 547-48 (quoting Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm — A Comment on the Nature of Arbitrary Rules*, 34 U.Fla.L.Rev. 477, 488-89 (1982)) (emphasis added). Based upon a more careful reading of *Gottshall*, however, I believe it is reasonable to conclude that the *Chan* test is consistent with *Gottshall*, at least in cases in which the plaintiff alleges a "stand-alone" claim for NIED —such as the one Stacy alleges—based on a threat of "immediate traumatic harm" which does not result in any actual physical impact or injury. *See Ayers,* 538 U.S. at 147-48 (*Gottshall* and *Buckley* describe two types of claim for negligently inflicted emotional distress: "stand-alone" claims not provoked by any physical impact or injury, for which recovery is sharply circumscribed by the zone-of-danger test; and claims for emotional distress brought on by a physical injury,

for which pain and suffering recovery has been traditionally permitted).

First, there are the facts of *Gottshall,* on the basis of which the Supreme Court found a potentially viable claim for NIED for one of the plaintiffs, Gottshall, but not for the other, Carlisle. Gottshall alleged that he suffered post-traumatic stress disorder as a result of seeing and being forced to participate in the events surrounding the collapse and death of his close friend and co-worker, Richard Johns, while they were working together on a railroad crew at a secluded job site, on an extremely hot and humid day, at an unreasonably fast pace, without any means of summoning emergency medical services after Johns suffered an apparent heat-related heart attack. *Id.* at 535-37.

Carlisle, on the other hand, alleged a claim for NIED based on his own job-related stress from working as a train dispatcher, and later as a trainmaster, who was responsible for ensuring the safe and timely movement of passengers and cargo under very difficult working conditions—including aging railstock and outdated equipment, and reductions in the work force that required him to take on additional duties and to work extremely long, erratic hours—which caused him to experience insomnia, headaches, depression, weight loss, and eventually a nervous breakdown. *Id.* at 539.

In rejecting the more flexible and expansive "foreseeability" test the Third Circuit applied to evaluate Gottshall's and Carlisle's claims for NIED, and specifically discussing the need to *limit* the class of plaintiffs eligible for recovery of damages, the Supreme Court made the following observations regarding Gottshall's claim:

> If emotional injury to Gottshall was "foreseeable" to Conrail, such injury to the other seven members of his work crew was also foreseeable. Because one need not witness an accident to suffer emotional

injury therefrom, however, the potential liability would not necessarily have to end there; any Conrail employees who heard or read about the events surrounding Johns' death could also foreseeably have suffered emotional injury as a result. Of course, not all of these workers would have been as traumatized by the tragedy as was Gottshall, but many could have been. Under the Third Circuit's standard, Conrail thus could face the potential of unpredictable liability to a large number of employees *far removed from the scene of the allegedly negligent conduct that led to Johns' death*.

512 U.S. at 553.[2] Thus, while not *explicitly* requiring that a railroad worker had to have "witnessed" his co-worker's death in order to bring a claim for NIED, this passage suggests that the Supreme Court intended to limit recovery to, at most, those members of the work crew who were working under the same conditions, were at the scene when Johns died, and suffered serious emotional injuries as a result of the negligent conduct of their employer that caused Johns's death.

There are also several annotations that compile the numerous state and federal cases on NIED, and support the district court's observation that "in nearly all of the cases the [*Gottshall*] Court cited as using the ["zone of danger"] test, the plaintiffs sought to recover for NIED on the basis that they had witnessed another person be injured."[3] *See, e.g., Recovery*

---

[2]The *Gottshall* court rejected Carlisle's claim without a great deal of analysis, finding no support in the common law for the Third Circuit's holding, "which would impose a duty to avoid creating a stressful work environment, and thereby dramatically expand employers' FELA liability to cover the stresses and strains of everyday employment." 512 U.S. at 554; *id.* at 558 (concluding that Carlisle's work-stress-related claim "plainly does not fall within the common law's conception of the zone of danger").

[3]The district court's observation on this point was quite accurate. Most of the cases cited by the *Gottshall* Court as allowing recovery damage for

*Under State Law for Negligent Infliction of Emotional Distress Due to Witnessing Injury to Another Where Bystander Plaintiff Must Suffer Physical Impact or Be in Zone of Danger,* 89 A.L.R. 5th 255 (2010); *Recovery for Negligent or Intentional Infliction of Emotional Distress Under Jones Act* (46 U.S.C.A. Appx. § 688) *or Under Federal Employers' Liability Act* (45 U.S.C.A. §§ 51 et seq.), 123 A.L.R. Fed. 583 (2010). Indeed, some of the cases cited by the *Gottshall* Court explicitly formulate the "zone of danger" test as including a "witnessed harm" requirement—i.e., a requirement that the plaintiff witnessed harm to another. *See, e.g.*, *Asaro v. Cardinal Glennon Mem'l Hosp.*, 799 S.W.2d 595, 599-600 (Mo. 1990) (holding that "a plaintiff states a cause of action for

---

NIED under a "zone of danger" test involved actual physical injuries to the plaintiff, or witnessed harm to a close family member, or both. *See Gottshall*, 512 U.S. at 547-48 & n.9 (citing, inter alia, *Keck v. Jackson*, 122 Ariz. 114 (1979) (plaintiff daughter witnessed automobile collision as a result of which her mother died and she suffered serious injuries); *Towns v. Anderson*, 195 Colo. 517 (1978) (brother, standing just off front porch of house, suffered serious emotional injuries from watching gas explosion as his sister remained inside); *Rickey v. Chicago Transit Authority*, 98 Ill.2d 546 (1983) (eight-year-old plaintiff suffered emotional injuries while watching younger brother choking nearly to death after his clothing got caught in an escalator); *Shuamber v. Henderson*, 579 N.E.2d 452 (Ind.1991) (mother and daughter, both of whom were physically injured, brought action for emotional injuries suffered as a result of watching son killed in car accident); *Watson v. Dilts*, 116 Iowa 249 (1902) (plaintiff wife was allowed to recover for emotional injuries suffered while witnessing defendant's assault on her husband); *Stewart v. Arkansas Southern R. Co.*, 112 La. 764 (1904) (defendant's negligence caused the train on which pregnant plaintiff rode to become decoupled, causing fellow passengers to suffer bloody injuries and injuring plaintiff's back); *Purcell v. St. Paul City R. Co.*, 48 Minn. 134 (1892) (plaintiff suffered convulsions and miscarriage from shock of near collision of streetcar on which she was riding); *Pankopf v. Hinkley*, 141 Wis. 146 (1909) (defendant negligently drove his automobile into horse-drawn carriage in which pregnant plaintiff's was riding, causing her to suffer severe fright and shock resulting in a miscarriage, which the court considered "physical injuries" to her ); *Garrett v. New Berlin*, 122 Wis.2d 223 (1985) (plaintiff sister could recover for emotional injuries suffered from witnessing her brother being run over by police car involved in chase)).

negligent infliction of emotional distress upon injury to a third person only upon a showing: (1) that the defendant should have realized that his conduct involved an unreasonable risk to the plaintiff, (2) that plaintiff was present at the scene of an *injury producing, sudden event*, (3) and that plaintiff was in the zone of danger, i.e., placed in a reasonable fear of physical injury to his or her own person") (emphasis added); *Rickey,* 98 Ill.2d at 556 ("[U]nder [the zone of danger rule,] a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress. This rule does not require that the bystander suffer a physical impact or injury at the time of the negligent act, but it does require that he must have been in *such proximity to the accident in which the direct victim was physically injured* that there was a high risk to him of physical impact.") (emphasis added)).[4] In light of this sizeable body of common law authority, I would conclude that the *Chan* panel's formulation of the "zone of danger" test, requiring the plaintiff to prove that he "witnessed harm or peril to another," is consistent with both the holding and the spirit of *Gottshall.*

## B.

Of course, Stacy does not, and apparently cannot, allege that he witnessed the collision that led to Wade's death. He

---

[4]The only case cited by the majority in support of its claim that "ample authorities apply[ ] the zone of danger test to direct victims, not only bystanders" is a district court decision, *Hall v. Norfolk S. Ry. Co.*, 829 F.Supp. 1571, 1576 (N.D. Ga. 1993), *see* slip op. at 9411 n.2, which surely cannot override the more recent decision of this Court in *Chan*, or this court's interpretation of the Supreme Court's decision in *Gottshall*, 512 U.S. 532, which was also decided after *Hall*. Indeed, the "zone of danger" test as formulated by *Hall* provides the majority only the thinnest of reeds to cling to, as it is drawn directly from the decision of the Third Circuit in *Gottshall v. Consol. Rail Corp.*, 988 F.2d 355, 361 (3d Cir.1993), which was reversed by the Supreme Court in *Gottshall*.

nevertheless alleges that he was in the "zone of danger" created by appellees' negligent conduct, and I have no doubt that Stacy has adequately pleaded (although, obviously, has not yet proven) that appellees were negligently operating the *Eva Danielsen* as it passed through the fishing grounds in dense fog. However, in addition to his failure to allege that he witnessed the deadly "peril or harm" to Wade, as required by *Chan*, 39 F.3d at 1409, Stacy's pleading falters because he has failed adequately to allege that he suffered "fright" or "shock" or any other type of severe emotional distress as a result of appellees' negligent conduct while he was in the "zone of danger." Indeed, and contrary to the majority's assertion, Stacy does *not* allege that he suffered "fright" or "shock" at all—neither as the *Eva Danielsen* approached the *Marja* on a collision course, nor as it passed the *Marja* "at close quarters," nor when he heard reports that it had run down a boat in the fishing fleet, nor when he eventually learned that it had run down the *Buona Madre* and killed its captain. Rather, Stacy only vaguely claims that the entire course of events, from the moment he detected the *Eva Danielsen* on his radar until four days later, when he learned the freighter had run down the *Buona Madre* and killed Wade, caused him to suffer severe emotional distress.

To be sure, the facts presented by Stacy are tragic and compelling, which might explain the majority's effort to extend the "zone of danger" test to the present context. It is perfectly understandable that Stacy—as well as all of the other fishermen who were fishing in dense fog when the *Eva Danielsen* came steaming through their fishing grounds on July 13, 2007, especially those who assisted with the search operation after the *Eva Danielsen* collided with the *Buona Madre,* as Stacy claims he did—might suffer great psychic trauma upon learning, after the fact, that one of their fellow fishermen died after being tossed into the ocean as a result of a collision with the freighter. They might also have suffered "survivor's guilt" for having failed to rescue Wade, who was allegedly, although unbeknownst to them at the time, still alive and

floating in the water near where they had been fishing. But, again, it appears that Stacy had no way of knowing that until days later. Stacy might well have suffered additional guilt from the fact that the post-collision search was called off as a result of his report that he and his boat, the *Marja*, were safe and sound and had not collided with the *Eva Danielsen*, as the latter ship had reported. Nevertheless, even assuming all of this to be true, Stacy has not alleged that he suffered fright or shock or severe emotional distress as a result of any "immediate traumatic harm" caused or threatened by his "near miss" with the *Eva Danielsen* while he was in the "zone of danger" created by appellees' negligent conduct—such as might have resulted if he had witnessed Wade's death. To the contrary, Stacy acknowledges that after he notified the Coast Guard and his fellow fishermen that he and the *Marja* were safe and sound, he returned to business as usual, and resumed fishing.

## C.

In concluding that Stacy has stated a claim upon which relief may be granted, I believe the majority conceives of a much more *expansive* "zone of danger" test than has been recognized to date by the Supreme Court, this court, or any other jurisdiction that has adopted that test. A not-so-hypothetical scenario to which many a landlubber can relate, and which is closely analogous to the facts of this maritime case, easily illustrates the problem.[5] Imagine this: Dense tule fog on Interstate 5 in the Central Valley of California. It's a Sunday evening, anytime between November and March, any year. Moderate traffic is flowing. Clusters of big-rig trucks loaded with freight and automobiles carrying Northern Californians are returning home from a long weekend in the Southland. A large pick-up truck loaded with bales of hay roars onto the I-

---

[5]The following hypothetical is loosely based on actual events which have occurred with some regularity on Interstate 5 and State Route 99 in California's Central Valley in recent years. *See* http://en.wikipedia.org/wiki/Tule_fog (visited June 1, 2010).

5 at Buttonwillow going 90 miles per hour, weaving in and out of the two northbound lanes, narrowly avoiding collisions with dozens, perhaps hundreds of other vehicles. Almost two hundred miles later, just before the pick-up reaches its destination in Tracy, it side-swipes a big rig, causing it to jack-knife and collide with another vehicle, ultimately entangling dozens of other automobiles in a fiery pileup. The next morning, the San Francisco Chronicle reports that 3 people were killed in the accident, and 20 more were seriously injured.

The majority and I probably would agree that the motorists who were directly involved in such an horrific crash (including, of course, the driver of the big-rig), and those who witnessed first-hand the carnage and destruction caused by the driver of the pick-up truck *as it occurred* without suffering any direct physical impact or injury, could state a claim for NIED against that driver and any other negligent actors who caused the crash, under any formulation of the "zone of danger" test. Under the majority's reading of the *Gottshall* "zone of danger" test, however, *every one* of the hundreds, perhaps thousands, of motorists and their passengers who were "frightened" by "near misses" with the pick-up truck as it sped erratically past them on that 200-mile stretch of I-5, or who were alarmed upon learning of the fiery wreck from news reports the next day, could *also* state a claim for NIED —whether or not they witnessed the accident and, indeed, possibly even if there was no collision at all.[6]

As this hypothetical demonstrates, recovery for NIED under a "zone of danger" theory—at least in cases involving

---

[6]The majority candidly acknowledges that its "zone of danger" test would have this incredibly broad reach. *See* slip op. at 9411 n.2. By the same token, every person aboard the fishing vessels in the fleet when the *Eva Danielsen* steamed through the fishing grounds at unsafe speed, and eventually ran down the *Buona Madre*, would have a viable claim for NIED if he or she was seriously upset by the events of that evening— whether or not they witnessed the collision in which Wade was killed, and no matter when they learned of his death.

a serious "injury producing, sudden event"—will depend in large part on how broadly the "zone of danger" is defined, both in geographic and temporal terms. In my view, the expansive reach the majority gives to the "zone of danger" is not consistent with *Gottshall*. *See* 512 U.S. at 553 (rejecting theory that workers who were "far removed from the scene" of the allegedly negligent conduct that led to a co-worker's death could recover for NIED). The *Chan* formulation of the "zone of danger" test, on the other hand, is consistent with both *Gottshall* and the majority of cases recognizing a claim of NIED under that theory. It is also the law of this circuit until such time as an en banc panel of this court or the Supreme Court disapproves it, and I believe we are bound to follow it. *Miller,* 335 F.3d at 893.

## IV.

Because the allegations of Stacy's first amended complaint do not satisfy the "zone of danger" test for NIED as stated in *Chan,* I would affirm the judgment of the district court dismissing his complaint for failure to state a claim upon which relief may be granted.